Caroline WINTER, et al.,
Plaintiffs-Appellees,

v.

Jeffrey C. MILLER, Director, Illinois
Department of Public Aid, et al.,
Defendants-Appellants.

No. 81–1387.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1981.

Decided April 20, 1982.

Ellen P. Brewin, Sp. Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

James D. Weill, Legal Asst. Found. of Chicago, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and GRANT,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The Supplemental Security Income Act for the Aged, Blind, and Disabled (Supplemental Security Income Act), 42 U.S.C. §§ 1381 *et seq.*, enacted in 1974, changed eligibility standards for Medicaid recipients. The change threatened to lengthen the Medicaid rolls and place immediate fiscal pressures on the states. To ease these pressures, Congress added § 209(b), 42 U.S.C. § 1396a(a), (f), to the Act. Section 209(b) gave states a choice: adopt the new standard or retain their eligibility standard in existence on January 1, 1972. The issue presented in this appeal is whether the Illinois Department of Public Aid may retain a standard under § 209(b) which it applied on January 1, 1972, but which may have violated federal Medicaid regulations as they existed on January 1, 1972.

I.

The Medicaid program, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, provides federal subsidies to states financing medical assistance to indigent families with dependent children, and to blind, disabled, or elderly individuals. Though a participating state must

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

submit a plan for approval to the Secretary of the Department of Health and Social Services, and adhere to federal Medicaid regulations, each state is given wide discretion in operating its program. The state plays a prominent role in setting "reasonable standards ... for determining eligibility ... for medical assistance." 42 U.S.C. 1396a(a)(17); *Schweiker v. Gray Panther*, 453 U.S. 34, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981).

Two types of recipients have traditionally received Medicaid assistance. The first, commonly called the "categorically needy," also received general welfare benefits under one of four other federal programs: Old Age Assistance, 42 U.S.C. §§ 301 *et seq.*, Aid to Families with Dependent Children, 42 U.S.C. §§ 601 *et seq.*, Aid to the Blind, 42 U.S.C. §§ 1201 *et seq.*, and Aid to the Permanently and Totally Disabled, 42 U.S.C. §§ 1351 *et seq.* The Medicaid laws required all participating states to provide benefits to the categorically needy.

In addition, a state could provide benefits to the "medically needy." The medically needy are those who had large medical expenses but incomes above the maximum for eligibility for general welfare programs. This left them with a disposable income below the categorically needy level after their medical bills were paid. Providing relief to the medically needy was optional even for states electing to participate in the general Medicaid program. However, having elected to supply benefits to both groups, a state had to use the same eligibility standards for each. A state providing benefits to both could not apply more strin-

gent income standards to the medically needy than to the categorically needy. *Caldwell v. Blum*, 621 F.2d 491, 495 (2nd Cir. 1980). The regulation embodying this rule, 45 C.F.R. § 248.21(a)(3)(i)(b) (1972), is the object of controversy in this lawsuit.[1]

Since the medically needy had incomes above the eligibility under the categorical assistance branch of the program, the Medicaid laws required them to "spend down" their income as a condition to receiving Medicaid benefits. "[F]amilies with incomes above the eligibility level would receive medicaid coverage only after incurring medical expenses equal to the amount by which their total income exceeded the medicaid standard; they would be required to 'spend-down' by this amount to establish their eligibility for medicaid." H.Rep. No. 92–231, 92d Cong., 1st Sess. (1971), *reprinted in* [1972] U.S. Code Cong. & Ad. News 4989, 5061.

The spend down concept was incorporated into the Medicaid Act at its origin. *Williams v. St. Clair*, 610 F.2d 1244, 1247 (5th Cir. 1980). The requirement placed the medically needy at parity with the categorically needy. After the medically needy spent down excess income, all Medicaid recipients had the same amount of income to spend on non-medical commodities and services.

In 1974, the newly enacted Supplemental Security Income Act brought major changes in the administration of Medicaid programs. The Act was aimed at federalizing the three general welfare programs for the aged, blind, and disabled. Under the

---

1. 45 C.F.R. § 248.21(a)(3)(i)(b) (1972) states in pertinent part:

Financial eligibility—medical assistance programs.

(a) State plan requirements. A State plan under Title XIX of the Social Security Act must:

\* \* \* \* \* \*

(3) With respect to the medically needy, if they are included in the plan:

(i) Provide levels of income and resources for maintenance, in total dollar amounts, as a basis for establishing financial eligibility for medical assistance. Under this requirement:

\* \* \* \* \* \*

(b) The income levels for maintenance must be, as a minimum, at the levels of the most liberal money payment standard used by the State, at any time on or after January 1, 1966, as a measure of financial eligibility in any categorical money payment program in the State.... Where a State imposes any deduction ... under the plan with respect to any medical assistance furnished to an individual thereunder, such charge may not be imposed to the extent that it would reduce the individual's income below the most liberal money payment standard referred to in the preceding sentence.

Act, the federal government assumed full responsibility for the programs, which had been formerly operated through cooperative state-federal financing and administrative efforts. By raising benefits and lowering eligibility criteria, the Act allowed more people with higher incomes to receive general welfare aid. However, as eligibility for Medicaid benefits was tied to eligibility for general welfare benefits, the Act threatened to swell the Medicaid rolls and place a large and immediate fiscal burden on participating states. The problem was so severe that Congress, fearing an exodus of participating states in 1974, added § 209(b) to the Act, 42 U.S.C. § 1396a(f), to stave off mass withdrawals from the program. *See* S.Rep. No. 553, 93rd Cong., 1st Sess., 56 (1973); *see also Gray Panthers*, 453 U.S. at 38, 101 S.Ct. at 2637. The addition allowed states to retain prior Medicaid eligibility standards. It provided:

> Notwithstanding any other provision of this subchapter . . . no State not eligible to participate in the State plan program established under subchapter XVI of this chapter shall be required to provide medical assistance to any aged, blind, or disabled individual . . . for any month unless such State would be (or would·have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved . . . and in effect on January 1, 1972, been in effect in such month. . . .

42 U.S.C. § 1396a(f).

The use of § 209(b) was made optional. The state could retain the income ceiling for eligibility it used on January 1, 1972 or adopt the higher federal limit governing general welfare eligibility under the Supplemental Security Income Act. However, § 209(b) required states to operate a program assisting the medically needy. Providing Medicaid coverage to the medically needy was no longer optional for states using the § 209(b) option. In pertinent part, § 209(b) provides:

> any . . . individual shall be deemed eligible for medical assistance under such State plan if (in addition to meeting such other requirements as are or may be im-

posed under the State plan) the income of any such individual . . . (after deducting . . . incurred expenses for medical care as recognized under State law) is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972.

42 U.S.C. § 1396a(f).

Like the pre-Supplemental Security Income Act program for the medically needy, § 209(b) incorporated a spend down requirement before applicants could receive Medicaid benefits. The medically needy still had to spend down excess income to the level which the state used in January, 1972 to determine eligibility for Medicaid benefits. This spend down requirement gave Medicaid coverage to those receiving general welfare benefits under the expanded eligibility standards of the Supplemental Security Income Act. Without the mandatory spend down provision, many receiving general welfare benefits under the Supplemental Security Income Act would not receive Medicaid benefits in states operating under § 209(b), despite their acknowledged need for general public assistance.

Illinois, along with fifteen other states, elected the § 209(b) option. *Gray Panthers*, 453 U.S. at 39, 101 S.Ct. at 2638 n.6. Eligibility for Medicaid is therefore determined by 1972 standards. Using 1972 figures, Illinois set $168 per month as the maximum income level for those receiving general welfare benefits from the federal government and as the level to which others with greater incomes must spend down their income.

Although federal regulations in 1972 clearly required the state to treat the categorically and medically needy alike, Illinois used two methods of measuring income, applying one to the medically needy and the other to the categorically needy, to determine eligibility for Medicaid benefits. The plaintiffs assert that because Illinois used two measures, eligibility requirements were more strict for some medically needy applicants. It follows, the plaintiffs argue, that because the system contravened federal regulations in 1972, its use today is invalid.

This discrepancy in eligibility standards arose because on January 1, 1972, Illinois computed its income ceiling for the categorically needy based upon an applicant's individual needs while it based eligibility for the medically needy on an inflexible income standard. In 1972, Illinois composed hypothetical budgets for individuals applying for categorical assistance under programs for the blind, aged, disabled, or families with dependent children. The budget could include more than fifty items recognized by the state as essential for subsistence. The state computed a budget for each individual based upon his personal needs, compared the hypothetical budget with the applicant's actual income, and if the budget exceeded his income, awarded general welfare benefits in the amount of the difference. Eligibility for general welfare benefits also left recipients eligible for Medicaid benefits. While the highest budget was $916 monthly, the budget at the 90th percentile, the level which the incomes of ninety percent of those receiving categorical assistance equalled or fell below, was a far more modest $168 per month.

In contrast to this system based on individualized needs, eligibility for the medically needy was derived on a standardized income basis. As a precondition to Medicaid eligibility, Illinois required the medically needy to spend down below a fixed income level based not on their individual needs but on the size of their family. Illinois set the income level for the medically needy at the 90th percentile of the actual incomes of those receiving categorical assistance. Therefore, before providing Medicaid benefits, the state required the medically needy to spend their income down below $168 per month, for an individual living alone, and $205 per month, for a two-member family.

Illinois used that method in 1972 only for evaluating the eligibility of the medically needy. With the passage of the Supplemental Security Income Act and § 209(b), Illinois began to use the method to determine all eligibility for Medicaid. Under the present Illinois system, individuals living alone and earning below $168 per month are automatically eligible for Medicaid benefits, but those with larger incomes must spend their income down below that amount before the state will subsidize their medical bills.[2]

The plaintiffs argue, and the Department does not dispute, that the implications of this dual system were clear. By using an income standard set at the 90th percentile of the incomes of categorically needy Medicaid recipients, Illinois required approximately ten percent of the medically needy to spend their incomes down below a level already designated by the state as the standard of minimum subsistence for others with identical needs. The plaintiffs argue this ensured the individual needs of approximately ten percent of the medically needy would go unmet and, therefore, clearly violated 45 C.F.R. § 248.21(a)(3)(i)(b) (1972). As mentioned, that regulation required:

> (b) The income levels for maintenance must be, as a minimum, at the levels of the most liberal money payment standard used by the State, at any time on or after January 1, 1966, as a measure of financial eligibility in any categorical money payment program in the State . . . .

The district court agreed and held that because this dual system was illegal from its origin, the state cannot now return to it under § 209(b). However, rather than require Illinois to compute all Medicaid eligibility according to individual needs, the district court allowed the state to retain the flat sum standard, but required the state to accommodate individual applicants requesting an eligibility determination based upon their individual needs.[3]

---

**2.** For reasons unrelated to this lawsuit, the eligibility level for receiving Medicaid benefits has been recently raised. An individual living alone with monthly income of $171 is now eligible for Medicaid benefits in Illinois. That is also the level such individuals must spend down their income to receive benefits as the medically needy.

**3.** Since neither the state nor the plaintiffs have taken issue with the form of the remedy, we do

## II.

We agree that the Illinois system operating in 1972 was illegal, and that the state may not now revert under § 209(b) to an illegally low income maximum simply because it used two levels, one legal, the other illegal, in 1972.

The dual eligibility system Illinois used in 1972 conflicted with then existing federal regulations. The legislative history of 42 U.S.C. § 1396a(a)(10)(B)(i) (1970), the original Medicaid provision authorizing states to enact a program for the medically needy, articulates congressional concern that states adopting such a program do not place the medically needy at a disadvantage vis-a-vis the categorically needy. It provided:

> The State may require the use of all the excess income of the individual toward his medical expenses, or some proportion of that amount. In no event, however, . . . may a state require the use of income or resources which would bring the individual's income below the amount established as the test of eligibility under the State plan. Such action would reduce

the individual below the level determined by the State as necessary for his maintenance.

S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* [1965] U.S. Code Cong. & Ad. News 1943, 2019.

The Illinois system disadvantaged the medically needy. Because Illinois did not allow the medically needy to prove that their individual needs exceeded the needs of ninety percent of the categorically needy, some medically needy applicants were required to spend down their income with the consequence that they could retain less disposable income than other recipients who, despite identical needs, received benefits under the categorical assistance branch of the program. 45 C.F.R. § 248.21(a)(3)(i)(b) (1972), the regulation of prime concern in this appeal, prohibits this result.[4]

The State, however, argues that the regulation was satisfied if *most* medically needy recipients were not disadvantaged. The Department places great emphasis on the use of the word "levels" in the regulation. It argues that implicit in the use of the

---

not consider whether that remedy was appropriate.

**4.** Illinois argues that 45 C.F.R. 248.3(c)(1)(ii)(B) (1972) did not require identical eligibility standards for the medically and categorically needy. It based that interpretation on 42 C.F.R. § 248.3(c)(1)(ii)(B) (1974), a successor regulation. That regulation governs eligibility for the medically needy in non-209(b) states. It is also not identical to the regulation it succeeded. It only requires the application of income standards "generally used" in general welfare programs to the medically needy. Section 4–30–30 of the Department of Health and Social Service's Medical Assistance Manual interprets the regulation and states that "special needs items which are allowed for most AFDC recipients in the state and state supplementary payments for which most of the aged, blind or disabled persons in the state can qualify, are considered to be generally used." HHS, Medical Assistance Manual, § 4–30–37. The state argues that because the regulation is limited to the special needs of "most" rather than all recipients, it therefore supports its interpretation of the predecessor regulation.

The argument assumes that amending the regulation was intended to clarify rather than change its meaning. The regulation is silent on this point. However, these changes came in the wake of the passage of the Supplemental

Social Security Act and § 209(b). Changes in the Medicaid law brought large changes in regulations governing Medicaid eligibility in 1974. In that light and in light of the unambiguous legislative history, we cannot give the successor regulation the weight which the state urges.

Illinois also places a second construction on the regulation. The state argues that the regulation only applies to interprogram income standards. It reasons that referring to the "most liberal money payment standard," the regulation only required Illinois to test eligibility for the medically needy by the most generous standard used among the several programs for the blind, aged, or disabled, or for families with dependent children.

The regulation must be read in full context. It required Illinois to apply to the medically needy the "income levels" of the "most liberal money payment standard used by the state" in providing Medicaid benefits to the categorically needy. Thus, even if the regulation required Illinois to apply its most generous need schedule, it still required the state to use the same "money payment standard" for the medically needy as it used for the categorically needy. Since Illinois used different standards, a special needs standard and a fixed income standard, this second construction does not address the issue raised on this appeal.

word is a recognition that the state had wide discretion in adopting a means to determine eligibility for Medicaid benefits and could set eligibility standards based purely upon estimates rather than individual needs. The Department contends that in view of its discretion, it is immaterial that an individualized assessment preceded eligibility decisions for categorical assistance.

The argument ignores the legislative history. The Senate Finance Committee Report shows that "in no event" may a state require a medically needy "individual" to spend down his income to a point below the "test of eligibility" set by the states as the minimum level of subsistence for those receiving categorical assistance. S.Rep.No. 404, 89th Cong., 1st Sess., *reprinted in* [1965] U.S. Code Cong. & Ad.News 1943, 2019. Yet the Illinois approach, which left some individuals who did not receive general public assistance worse off than others who did receive it, required precisely this. *See Brown v. Beal*, 404 F.Supp. 770, 778 (D.C.E.D.Pa.1975). Therefore, the principle behind the regulation was clear, and a state's broad discretion in selecting among methods for testing eligibility for Medicaid benefits did not alter its application. The Department points to no difference which could indicate that the principle manifest in the regulation and the legislative history should not apply to a Medicaid eligibility

system based upon individual needs. Thus, while it could be true, as the Department argues, that in drafting the regulation the Secretary did not envision an eligibility program based upon individual needs, it does not follow that Congress did not intend to apply the principle behind the regulation to a special needs program.[5]

Other courts, considering the issue under similar circumstances, have invalidated discrepancies in eligibility standards between the medically and categorically needy. *Caldwell v. Blum*, 621 F.2d 491, 495 (2nd Cir. 1980); *Greklek v. Toia*, 565 F.2d 1259, 1261 (2nd Cir. 1977) (per curiam); *Aitchison v. Berger*, 404 F.Supp. 1137, 1145–46 (D.C.S. D.N.Y.1975), aff'd. mem., 538 F.2d 307 (2nd Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Brown v. Beal*, 404 F.Supp. 770, 778–80 (D.C.E.D.Pa.1975); *Schaak v. Schmidt*, 344 F.Supp. 99, 103 (D.C.E.D.Wis.1971) (three judge court).[6] In *Greklek*, the Second Circuit held that New York's disparate treatment of the medically and categorically needy in computing net income from which to judge Medicaid eligibility could not stand. Much like Illinois, New York calculated a portion of the categorically needy's income on an individualized basis but estimated the medically needy's income on a flat sum basis. In order to determine eligibility for Medicaid, New York allowed the categorically needy

**5.** Relying on an affidavit from the Regional Commissioner who approved the state Medicaid plan for HEW, Illinois argues that approval in 1972 indicates HEW agreed with its interpretation of the regulation. The affidavit does not support this argument. The affidavit did not expressly consider the issue before us. Instead, it was given to clarify which of two state plans were in force on January 1, 1972. Under these circumstances, we cannot conclude that the affidavit or approval of the plan by the regional office was an official interpretation of the regulation by HEW entitled to great weight under *Miller v. Youakim*, 440 U.S. 125, 144–145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979). *See Aitchison v. Berger*, 404 F.Supp. 1137, 1148 (D.C.S.D.N.Y.1975), aff'd mem., 538 F.2d 307 (2nd Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

**6.** The court in *Aitchison v. Berger*, 404 F.Supp. 1137 (S.D.N.Y.1975), aff'd mem., 538 F.2d 307 (2d Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct.

246, 50 L.Ed.2d 172 (1976), held that differences in calculating housing allowances for the medically and categorically needy violated a successor of the regulation at issue. In *Aitchison* the state made shelter allowances in calculating incomes for Medicaid eligibility. It gave allowances for the categorically needy based on the actual amount of rent paid. The allowance, however, could not exceed the department's rent guidelines for the county in which the categorically needy recipient resided. In contrast, the state computed allowances for the medically needy at the average of the allowances given the categorically needy. This approach left approximately fifty percent of the medically needy worse off than those similarly situated receiving categorical assistance. The district court concluded that the method violated Medicaid regulations. The defendant's attempts to distinguish *Aitchison* are unpersuasive.

to deduct individual work related expenses from their gross income and the state then used this net income for its eligibility decision. In contrast, the state only allowed the medically needy a standard deduction calibrated to the size of the applicant's household. The Second Circuit concluded "the use of a dual system to determine Medicaid eligibility violates the core statutory and regulatory requirement that the groups involved be treated the same in this respect." *Greklek*, 565 F.2d at 1261 n.5.

There is little difference between *Greklek* and the immediate case. Work related expenses are but one category of personal needs which Illinois could have recognized in computing individual budgets. The New York system, like the Illinois system, was based upon the principle that since individuals receiving Medicaid do not have the same needs, entitlement to public medical assistance is reflected as much by fixed living expenses as personal income. In *Greklek*, applying this philosophy only to the categorically needy violated a core tenet of the Medicaid law. The Illinois system in 1972 was no different.

As such, we conclude that the Illinois system operating in 1972 violated federal Medicaid regulations and that the State may not revert today under § 209(b) to a Medicaid eligibility standard invalid from its origin.[7]

Affirmed.

---

7. We do not reach appellees' second argument. All other arguments not expressly considered are deemed to be without merit.