(No. 66347.—

CHRISTOPHER HESSION, Appellee, v. THE ILLINOIS DEPARTMENT OF PUBLIC AID *et al.*, Appellants.

*Opinion filed September 20, 1989.*

CALVO, J., took no part.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz and Shawn Denney, Solicitors General, and Karen Konieczny, Assistant Attorney General, of Chicago, of counsel), for appellants.

Paul A. Grabowski, of Hayt, Hayt & Landau, of Evanston, for appellee.

Wendy Meltzer, of Chicago, for *amicus curiae* Illinois Citizens for Better Care.

JUSTICE MILLER delivered the opinion of the court:

The plaintiff, Christopher Hession, through Little Company of Mary Hospital, filed a complaint for administrative review in the circuit court of Cook County. Hession sought judicial review of a final decision of the Illinois Department of Public Aid (Department) denying his application for medical assistance for the months of October, November and December 1982. The circuit court affirmed in part and reversed in part the Department's decision. The court agreed with the Department that Hession was ineligible for assistance for the month of October but concluded that he was entitled to assistance

for the months of November and December. Hession appealed to the appellate court that portion of the circuit court's judgment finding him ineligible for medical assistance for October 1982. The appellate court reversed the trial court's judgment, concluding that Hession was entitled to medical assistance for October 1982 in addition to that provided for November and December. (163 Ill. App. 3d 553.) We allowed the Department's petition for leave to appeal from the appellate court's judgment pursuant to Supreme Court Rule 315 (107 Ill. 2d R. 315).

Christopher Hession entered Little Company of Mary Hospital on October 7, 1982, and remained there through December 5, 1982. During the course of his hospitalization, Hession incurred medical expenses totaling approximately $35,000. On November 8, 1982, a month after his admission, Hession, with the hospital's assistance, filed with the Department an application for medical assistance under the Medicaid program.

After receiving Hession's application, the Department requested a telephone interview to verify the information provided on the application. Hession's former wife telephoned the Department on November 19, 1982, and spoke with the caseworker handling Hession's application. Mrs. Hession explained that her former spouse lived alone, had no life or medical insurance, had been unemployed since 1980 and received no income other than that derived from occasional odd jobs. Pursuant to the caseworker's request, a copy of Hession's savings account passbook was forwarded to the Department. The passbook was received by the Department on November 24, 1982, and showed a balance of $1,927.01. On December 8, 1982, the Department mailed Hession a notice explaining that it had denied his application because the reported value of his savings account exceeded the agency's $1,500 "asset disregard." By agency standards, the first $1,500 in assets of a single person residing

alone must be disregarded in assessing that person's eligibility for medical assistance.

On December 16, 1982, Little Company of Mary Hospital, on Hession's behalf, filed with the Department a notice appealing the denial of Hession's application for medical assistance. Following a hearing, the Department issued its final decision on January 13, 1983. The Department concluded that, based on departmental regulations, the caseworker had correctly denied Hession's application because the balance in Hession's savings account exceeded the asset disregard of $1,500 on the date his eligibility for assistance was determined.

Hession then filed a complaint for administrative review in the circuit court of Cook County on February 16, 1983. Hession moved for judgment on the pleadings, arguing, among other things, that the Department's policy which found him ineligible for medical assistance by considering his excess assets without reference to his incurred medical expenses was unreasonable. Additionally, Hession pointed out that the Department had an asset reduction policy which permitted individuals to reduce their assets below the asset disregard by paying medical bills or making other allowable transfers after applying for benefits but prior to the Department's disposition of their applications and in that way to qualify for medical assistance. Citing *Brengola-Sorrentino v. Department of Public Aid* (1984), 129 Ill. App. 3d 566, Hession contended that he had a due process right to be informed of the Department's asset reduction policy prior to a determination of his eligibility for assistance.

On February 20, 1986, the court entered an order affirming in part and reversing in part the Department's final decision denying Hession's application for medical assistance. The court concluded that Hession was entitled to assistance for the months of November and December 1982 because the Department had failed to ad-

vise Hession that, in order to qualify for assistance, he could have reduced his assets below the asset disregard prior to the disposition of his application. However, the court determined that Hession was ineligible for assistance for October 1982, noting that, even if the Department had informed Hession of its asset reduction policy when he applied in November 1982, Hession could not have retroactively reduced his assets in November 1982 to bring them within allowable limits for October 1982. The circuit court did not believe that the Department was required to consider the medical expenses incurred by Hession during the month of October in determining his eligibility for assistance for that month.

Hession appealed to the appellate court the circuit court's partial affirmance of the Department's decision finding him ineligible for assistance for October 1982. The Department did not cross-appeal that portion of the court's judgment finding Hession entitled to medical benefits for November and December 1982 because of the Department's failure to advise Hession of its asset reduction policy.

In the appellate court, Hession did not argue that he was entitled to medical assistance for the month of October 1982 because he was not told by the Department of its asset reduction policy. Instead, Hession renewed his argument that the Department was required by the Medicaid Act (42 U.S.C. §1396 *et seq.* (1982)), by the Illinois Public Aid Code (see Ill. Rev. Stat. 1987, ch. 23, par. 5—1 *et seq.*), and by the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2) to consider his medical expenses as well as his assets in determining his eligibility for Medicaid assistance for that month. The appellate court agreed with Hession that the Illinois Public Aid Code requires the Department to utilize a "resource spend down" methodology in determining an ap-

plicant's eligibility. (163 Ill. App. 3d at 559-60.) Under this methodology, applicants who incur medical expenses in excess of their assets above the asset disregard are eligible to receive Medicaid benefits; the amount of their benefit, however, is reduced by the amount of their excess assets. Thus, the appellate court concluded that Hession was entitled to medical assistance for the month of October 1982 to the extent his incurred medical expenses exceeded the approximately $400 in assets that he possessed above the $1,500 limitation. The Department petitioned this court for leave to appeal the appellate court's judgment, and we allowed the petition.

The single issue presented in this appeal is whether the Department must consider the amount of an applicant's incurred medical expenses as well as the amount of his or her assets when determining eligibility for medical assistance under the Medicaid program. We conclude that it must and therefore affirm the judgment of the appellate court.

In 1965, Congress enacted title XIX of the Social Security Act (42 U.S.C. §1396 *et seq.* (1982)), also known as the Medicaid Act (the Act). This act established a program by which the Federal government reimburses States participating in the program for a portion of the costs incurred by those States in providing certain medical services to needy individuals. (*Schweiker v. Gray Panthers* (1981), 453 U.S. 34, 36, 69 L. Ed. 2d 460, 465, 101 S. Ct. 2633, 2636.) To participate in the Medicaid program, a State must develop, and then file with the Secretary of Health and Human Services, a plan which complies with requirements imposed both by the Medicaid Act and by the Secretary. (*Gray Panthers*, 453 U.S. at 37, 69 L. Ed. 2d at 465, 101 S. Ct. at 2636.) Each State must designate a single agency to administer or supervise the administration of its Medicaid plan. (42 U.S.C. §1396a(a)(5) (1982).) Illinois has elected to partici-

pate in the Medicaid program (see Ill. Rev. Stat. 1987, ch. 23, par. 5—1 *et seq.*), and the agency responsible for administering the program in Illinois is the Illinois Department of Public Aid (Ill. Rev. Stat. 1987, ch. 23, par. 12—4.4).

The Medicaid program has traditionally provided medical assistance for two categories of recipients, the "categorically needy" and the "medically needy." (*Winter v. Miller* (7th Cir. 1982), 676 F.2d 276, 277.) The categorically needy are those individuals who are eligible to receive cash assistance under one of the general welfare programs, either the Aid to Families with Dependent Children program (AFDC) (42 U.S.C. §601 *et seq.* (1982)) or the Supplemental Security Income for the Aged, Blind, or Disabled program (SSI) (42 U.S.C. §1381 *et seq.* (1982)). (*Winter*, 676 F.2d at 277.) The medically needy are persons who lack the ability to pay for medical services but who are ineligible for cash assistance under AFDC or SSI because their income or resources exceed the eligibility standards for those programs. (*Winter*, 676 F.2d at 277.) Hession applied for assistance under the medically needy portion of the program.

The Department argues that, at the time Hession applied for medical assistance in November 1982, two sections of the Medicaid Act prohibited its use of the resource spend down methodology in determining Medicaid eligibility. The Department claims that because the States must conform to Federal requirements in order to participate in the Medicaid program, the Department was precluded from employing this methodology when evaluating Hession's eligibility for Medicaid.

According to the Department, the first section which prohibited the resource spend down methodology at the time Hession applied for medical assistance was section 1396a(a)(10)(C)(i)(III) (42 U.S.C. §1396a(a)(10)(C)(i)(III) (1982)). This section, referred to as the "same methodol-

ogy proviso" before its amendment, provided that a State's plan to furnish Medicaid to the medically needy was required to set forth:

"the single standard to be employed in determining income and resource eligibility *** and the methodology to be employed in determining such eligibility, which shall be the same methodology which would be employed under [AFDC or SSI] ***."

The Department argues that this provision required it to use the SSI criteria (42 U.S.C. §1381 *et seq.* (1982)) when evaluating medically needy applicants such as Hession for Medicaid. According to the Department, SSI applicants and recipients have always been found ineligible for assistance when their resources exceeded the disregard amount set by law. (See 42 U.S.C. §1382(a)(1)(B) (1982).) Thus, the Department concludes that because a resource spend down was not permitted in determining SSI eligibility, the same methodology proviso did not permit the Department to use a resource spend down methodology in assessing Medicaid eligibility for medically needy applicants such as Hession.

In support of its interpretation of the same methodology proviso, the Department points to a recent amendment to section 1396a(a)(10)(C)(i)(III) of the Medicaid Act. With the enactment of the Medicare Catastrophic Coverage Act of 1988 (MCCA), the "same methodology" language of this section was eliminated. (See Pub. L. No. 100–360, tit. 3, §303(e)(1), 102 Stat. 683, 763 (1988).) Section 1396a(a)(10)(C)(i)(III) now provides that the methodology used in determining Medicaid eligibility for the medically needy shall be "no more restrictive" than that used in determining the eligibility of the categorically needy. Moreover, section 303(e)(5)(C) of the MCCA (Pub. L. No. 100–360, tit. 3, §303(e)(5)(C), 102 Stat. 683, 763 (1988) (codified at 42 U.S.C.A. §1396a(r)(2)(A) (West Supp. 1989))) added language to provide that the

methodology to be employed in determining income and resource eligibility for individuals under section 1396a(a)(10)(C)(i)(III) may be less restrictive than the methodology used in the case of the categorically needy. These amendments apply to medical assistance furnished on or after October 1, 1982. Pub. L. No. 100—360, tit. 3, §303(g)(6), 102 Stat. 683, 764 (1988) (codified at 42 U.S.C.A. §1396r—5 note (West Supp. 1989)).

Although these amendments do not provide specifically for the use of a resource spend down, the Department concedes that, because the resource spend down methodology is less restrictive than that used in determining eligibility for the categorically needy, the effect of the amendments is to give States the discretion to employ this methodology. Further, the Department acknowledges that Federal reimbursement is authorized for States which used the resource spend down methodology in determining Medicaid eligibility after October 1, 1982. The Department argues, however, that the enactment of an amendment creates a presumption that the legislature intended to change, and not reaffirm, existing law. The Department then concludes that, because Congress only recently authorized the use of the resource spend down methodology, the Department was prohibited from using it prior to the enactment of the recent amendments.

While it is true that normally an amendment is presumed to change the law as it formerly existed, the circumstances surrounding the enactment of an amendment must also be considered. (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 271.) If the circumstances suggest that the legislature intended to interpret the original statute, the presumption of change is rebutted. (*O'Connor*, 81 Ill. 2d at 271.) In this case, the legislative history of section 1396a(a)(10)(C)(i)(III) indicates that Congress intended to clarify rather than change the re-

quirements imposed by the same methodology proviso and thus refutes any presumption of change which might otherwise exist because of the amendment.

Section 1396a(a)(10)(C)(i)(III), and its predecessor, section 1902(a)(10)(B)(i), have been the subject of a series of amendments. (See *Atkins v. Rivera* (1986), 477 U.S. 154, 91 L. Ed. 2d 131, 106 S. Ct. 2456; *DeJesus v. Perales* (2d Cir. 1985), 770 F.2d 316.) Without reviewing the substance of each of these changes, it is sufficient to say that Congress has seemingly encountered some difficulty in expressing its intent regarding the relationship between the eligibility criteria and methodologies to be used in the case of the categorically and medically needy. In this case, it is important to recognize that, in enacting the "same methodology" requirement, Congress intended only to invalidate Department of Health and Human Services (HHS) regulations that had "allow[ed] the States to impose more restrictive [income and resource] standards and methodologies than under previous law." (See H.R. Rep. No. 861, 98th Cong., 2d Sess. 1366-67, *reprinted in* 1984 U.S. Code Cong. & Admin. News 1445, 2054-55.) Congress did not intend to change the policies governing the eligibility of the medically needy from those previously existing policies which had allowed States to employ methodologies (such as a resource spend down) which were less restrictive than those used for the categorically needy. See H.R. Rep. No. 861, 98th Cong., 2d Sess. 1366-67, *reprinted in* 1984 U.S. Code Cong. & Admin. News 1445, 2054-55.

In the Deficit Reduction Act of 1984 (Pub. L. No. 98—369, 98 Stat. 494 (1984)), Congress, believing that HHS had implemented the "same methodology" language in an overly literal fashion, imposed a moratorium on disapproving State Medicaid plans that used less restrictive income and resource standards and methodologies. (See H.R. Rep. No. 861, 98th Cong., 2d Sess.

1366-67, *reprinted in* 1984 U.S. Code Cong. & Admin. News 1445, 2054-55.) Thus, by imposing the moratorium, Congress reaffirmed its original intent in enacting the "same methodology" requirement, which was to prohibit the use of more restrictive methodologies while allowing the use of those less restrictive. See *Atkins v. Rivera,* 477 U.S. at 166 n.10, 91 L. Ed. 2d at 143 n.10, 106 S. Ct. at 2463 n.10.

The recent changes in the language of section 1396a(a)(10)(C)(i)(III) effected by the MCCA merely codify the moratorium. (H.R. Rep. No. 661, 100th Cong., 2d Sess. 145, 268, *reprinted in* 1988 U.S. Code Cong. & Admin. News 923, 1046.) Because the legislative history indicates that the same methodology proviso was never intended to preclude the use of less restrictive methodologies, the subsequent amendments to this section of the Medicaid Act which specifically allow less restrictive methodologies (*i.e.,* a resource spend down) must be viewed as clarifying and reaffirming, rather than changing, existing law. We therefore reject the Department's argument that the passage of the MCCA changed existing law and that, at the time Hession applied for medical assistance, the same methodology proviso prohibited the Department from using the resource spend down methodology in determining Hession's Medicaid eligibility.

The second provision of the Act that the Department contends forbids the use of resource spend down is section 1396a(a)(17) (42 U.S.C. §1396a(a)(17) (1982)). This section provides in relevant part:

"(a) Contents

A State plan for medical assistance must—

\* \* \*

(17) include reasonable standards \* \* \* for determining eligibility for and the extent of medical assistance under the plan which \* \* \* (B) provide for taking into account only such income and resources as are,

as determined in accordance with standards pre-
scribed by the Secretary, available to the applicant or
recipient and *** as would not be disregarded (or set
aside for future needs) in determining his eligibility
for such aid, assistance, or benefits, (C) provide for
reasonable evaluation of any such income or re-
sources, and (D) *** provide for flexibility in the ap-
plication of such standards with respect to income by
taking into account *** the costs *** incurred for
medical care or for any other type of remedial care
recognized under State law."

The Department argues that the plain language of
this provision precludes the application of a resource
spend down. The Department notes that this section sets
forth the elements which a State Medicaid plan must
contain and contends that, because a resource spend
down is not mentioned in this section or in the corres-
ponding HHS regulations (see 42 C.F.R. §§435.840
through 435.852 (1987)), the Department is not permit-
ted to use this methodology.

In support of its plain language argument, the De-
partment relies on a Medicaid action transmittal issued
to all State agencies administering medical assistance
programs by the Health Care Financing Administration
of HHS in August 1980 (Medicaid Action Transmittal
No. 80—58 (August 1980)). In the transmittal, HHS ac-
knowledged that its predecessor, the Department of
Health, Education and Welfare (HEW), had previously
interpreted the Medicaid Act as allowing States to use a
resource spend down in determining Medicaid eligibility
(see HEW Handbook of Public Administration, Medical
Assistance Programs, D—4240 (June 28, 1966)). The
action transmittal, however, indicated that the prior in-
terpretation of the Act had been erroneous. The trans-
mittal stated that, although section 1396a(a)(17)(D) of the
Medicaid Act provided that the amount of incurred medi-
cal expenses could be considered when determining in-

come eligibility limits, neither the Act nor Federal regulations allowed the States to consider the amount of incurred medical expenses in determining resource eligibility limits. The Department does not argue that the action transmittal bound it to a certain method of evaluating Medicaid eligibility. Rather the Department contends that the transmittal is persuasive authority for its position that the language of section 1396a(a)(17)(D) prohibits it from using a resource spend down.

We do not agree that the plain language of section 1396a(a)(17) precludes the Department from applying a resource spend down. As noted by the Department, the language of this provision contains no specific reference to a resource spend down. Moreover, the Department has not cited, and we have not identified, any language in this section which forbids, even in general terms, the use of this methodology. We, therefore, do not believe that the language of the section prohibits the use of the spend down methodology with respect to resources.

Furthermore, we do not find the action transmittal of the HCFA (Health Care Financing Administration of HHS) persuasive in this respect. As stated above, HEW had previously interpreted this section of the Act to allow the States to employ a resource spend down. Although the language of section 1396a(a)(17) remained unchanged, HHS subsequently interpreted the section as prohibiting a resource spend down but gave no explanation for the change in its position. Thus the action transmittal persuades one to believe that the language of this section is susceptible to varying interpretations rather than to believe that the plain language of the statute forbids the use of the resource spend down methodology.

The Department next argues that, if the statutory language is ambiguous, the rule of statutory construction, "express mention and implied exclusion," resolves any ambiguity in its favor. The Department notes that

the statute expressly mentions the use of an income spend down. According to the Department, by failing to mention a resource spend down, the statute impliedly excludes its use. Thus, the Department contends that section 1396a(a)(17)(D) must be interpreted as prohibiting the resource spend down methodology.

The principle of statutory construction relied on by the Department does not lead to the conclusion for which it is advanced. The principle of "express mention and implied exclusion" holds that the enumeration of certain things in a statute implies the exclusion of all others. (*In re Estate of Leichtenberg* (1956), 7 Ill. 2d 545, 552.) Section 1396a(a) enumerates certain requirements which State Medicaid plans must contain. Thus, application of the proposed rule of construction would lead to the conclusion that, because a resource spend down is not expressly mentioned in this section, the section imposes no requirement on the States to employ this methodology. It would not compel the conclusion that States are prohibited from applying a resource spend down. Simply stated, we perceive nothing in section 1396a(a)(17) which precludes a State that participates in the Medicaid program from using the resource spend down methodology if it chooses to do so. Accord *Walter O. Boswell Memorial Hospital, Inc. v. Yavapai County* (App. 1986), 148 Ariz. 385, 714 P.2d 878; *Haley v. Commissioner of Public Welfare* (1985), 394 Mass. 466, 476 N.E.2d 572.

Having concluded that neither of the Medicaid Act sections relied on by the Department prohibits the use of a resource spend down, we must still decide whether the Department is legally required to utilize this methodology in determining Medicaid eligibility. Hession contends that the appellate court correctly concluded that the Illinois Public Aid Code (Code) requires the application of a resource spend down. The Department maintains that it

is not required to apply a resource spend down because the Code does not specifically mention this methodology. Because the Department's refusal to allow a spend down with respect to resources is inconsistent with the Illinois Public Aid Code's objectives, we find the Department's argument unpersuasive.

Illinois has chosen to provide medical assistance to the medically needy as well as the categorically needy. Section 5—2(2) of the Code describes as eligible "[p]ersons otherwise eligible for basic maintenance under [SSI and AFDC] but who fail to qualify thereunder on the basis of need, and who have insufficient income and resources to meet the costs of necessary medical care." (Ill. Rev. Stat. 1987, ch. 23, par. 5—2(2).) In establishing an assistance program for these individuals, the legislature has noted that it is of special importance that their incentives for continued independence be maintained and that their limited resources be preserved. (Ill. Rev. Stat. 1987, ch. 23, par. 5—1.) In furtherance of this goal, the Code requires that, in the case of single individuals residing alone, the Department must disregard at least $1,500 in assets when determining Medicaid eligibility. (Ill. Rev. Stat. 1987, ch. 23, par. 5—2.) This provision expresses the legislature's intent that these individuals should be allowed to retain a certain level of assets and still qualify for medical assistance.

By failing to consider an individual's incurred medical expenses as well as his or her assets, the Department defeats the legislature's intent. Under the Department's policy, a Medicaid applicant possessing resources in excess of the asset disregard is found to be ineligible for medical assistance despite the fact that the applicant may have incurred medical expenses which far exceed his or her resources. Because the applicant is not eligible for assistance, he or she becomes personally responsible

for paying these bills and is required to deplete the assets which the legislature intended to be disregarded.

In contrast, by allowing an applicant to spend down the assets above the disregard with incurred medical expenses, the applicant is entitled to Medicaid benefits once the medical expenses exceed the excess in assets. Thus, an individual is allowed to retain a certain level of assets and is personally liable for his or her medical expenses only to the extent that his or her resources exceed permissible limits. Considering the legislature's intent that the medically needy be allowed to retain some of their assets, we conclude that the Department must employ the resource spend down methodology when determining Medicaid eligibility for these individuals.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.