REBA C. ELLIOT, GUARDIAN FOR BOBBY G. CASSTEVENS v. NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES

———————

BILLY PAGE SEXTON, ADMINISTRATOR FOR WILMA J. SEXTON v. DAVID H. FLAHERTY, SECRETARY NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES AND MARY DEYAMPERT, DIRECTOR, DIVISION OF SOCIAL SERVICES, NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES IN THEIR OFFICIAL CAPACITIES

No. 9317SC352
No. 9323SC718

(Filed 2 August 1994)

1. **Social Services and Public Welfare § 24 (NCI4th)— Medicaid—resource spend-down defined**

    "Resource spend-down" is the process which allows Medicaid applicants to offset their resources by incurred but unpaid medical bills.

    **Am Jur 2d, Welfare Laws §§ 40 et seq.**

2. **Social Services and Public Welfare § 24 (NCI4th)— federal Medicaid plan—resource spend-down permitted but not required**

    Federal Medicaid law permits but does not require states to implement resource spend-down.

    **Am Jur 2d, Welfare Laws §§ 40 et seq.**

**3. Social Services and Public Welfare § 24 (NCI4th)— North Carolina Medicaid plan—resource spend-down not required**

The North Carolina Medicaid plan does not require DHR to utilize resource spend-down when evaluating Medicaid eligibility, since the North Carolina Medicaid statute does not have a specific resource spend-down provision in its plan; pursuant to N.C.G.S. §§ 108A-25(b) and -54, which grant DHR plenary authority to adopt rules and regulations to administer the Medicaid program, DHR has established rules which prohibit the use of resource spend-down in North Carolina's Medicaid program; the federal Medicaid statute contains language similar to language in N.C.G.S. § 108A-55, and the federal statute does not require resource spend-down; and an interpretation of 42 U.S.C. § 1396(a)(34) as mandating resource spend-down would conflict with 42 U.S.C. § 1396a(f).

**Am Jur 2d, Welfare Laws §§ 40 et seq.**

Judge JOHN dissenting.

Appeal by petitioner from order signed 30 December 1992 by Judge James M. Long in Stokes County Superior Court, and filed with the Clerk of Court 8 January 1993. Heard in the Court of Appeals 31 January 1994.

*Attorney General Michael F. Easley, by Assistant Attorney General Jane T. Friedensen and Associate Attorney General Elizabeth J. Weese, for respondent-appellee.*

*Legal Aid Society of Northwest North Carolina, Inc., by Joseph P. Henry, for petitioner-appellant.*

Appeal by petitioner from order entered 3 May 1993 by Judge D. Marsh McLelland in Alleghany County Superior Court. Heard in the Court of Appeals 31 January 1994.

*Attorney General Michael F. Easley, by Assistant Attorney General Claud R. Whitener, III, for respondent-appellee.*

*Legal Services of the Blue Ridge, Inc., by Charlotte Gail Blake, for petitioner-appellant.*

McCRODDEN, Judge.

Upon motions of respondents, this Court has consolidated these appeals, both of which arise out of the Department of Human

## ELLIOT v. N.C. DEPT. OF HUMAN RESOURCES

[115 N.C. App. 613 (1994)]

Resources's (DHR's) denial of medical assistance benefits (Medicaid) sought by petitioners. Respondents denied Medicaid benefits to petitioners because petitioners' resources exceeded the allowable reserve limit. For a single person such as Mr. Casstevens, the applicable asset limit to receive Medicaid benefits through DHR is $1,500.00. N.C. Admin. Code tit. 10, r. 50B.0311(c) (August 1993). The asset limit for a two-person household, applicable to the Sextons, is $2,250.00. *Id.*

The pertinent facts in No. 9317SC352 are as follows. Petitioner Reba Elliot is the sister and guardian of Bobby G. Casstevens, who is mentally disabled, resides in Knollwood Hall Nursing Facility ("Knollwood"), and who had been receiving Medicaid benefits prior to 1 January 1991. On 1 January, Mr. Casstevens inherited $4,874.97 from his father's estate, which Ms. Elliot reported to the Stokes County Department of Social Services ("DSS"). DSS informed her that, because her brother was no longer eligible for Medicaid, his benefits would be terminated. DSS also told her that she should reapply for Medicaid when his reserve was reduced to the $1,500.00 allowable reserve limit.

Knollwood was not aware of the termination of Mr. Casstevens' Medicaid benefits, and consequently did not bill Ms. Elliot for her brother's care for the period from January until May. Ms. Elliot reapplied for Medicaid on 30 May 1991, after having paid Knollwood $3,700.00, thereby reducing his balance to below the reserve limit. On 5 July 1991, DSS granted prospective Medicaid coverage effective 30 May 1991, but denied retroactive coverage from the period of 3 April through 30 May 1991. The nursing home bills, incurred between 3 April and 30 May, totalled $3,938.99.

Ms. Elliot appealed DSS' decision to DHR, which affirmed the denial of retroactive benefits. Pursuant to N.C. Gen. Stat. § 108A-79(k) (1988), petitioner Elliot appealed the final decision to the superior court. From the superior court's order affirming the agency decision, petitioner Elliot appeals.

The facts in No. 9323SC718 are as follows. Petitioner Billy Page Sexton was married to Wilma J. Sexton, who was hospitalized for her final illness at Forsyth Medical Center in 1992. When Mr. Sexton applied for Medicaid benefits on his wife's behalf on 2 March 1992, he disclosed that he owned stock valued at $5,500.00 in Blue Ridge Bank. He was informed that, because the stock put them over the state

agency's resource level of $2,250.00 for a two-person household, his wife could not qualify for Medicaid until he transferred the stock. Mr. Sexton planned to transfer the stock to his daughter, Glenda Medley, on 5 March 1992. However, before he was able to transfer the stock, he received a call from the hospital informing him that his wife was dying. Ms. Sexton died on 6 March 1992. Blue Ridge Bank issued a stock certificate dated 6 March 1992, which transferred ownership of the stock to Glenda Medley on 26 March 1992.

Ms. Sexton's medical bills at the time of the hearing exceeded $50,000.00. Alleghany County DSS denied Mr. Sexton's application for Medicaid benefits because the excess reserve had not been reduced at the time of Ms. Sexton's death. Mr. Sexton ultimately filed a petition for judicial review in the superior court. Mr. Sexton appeals from Judge D. Marsh McLelland's order of 3 May 1993, affirming the final administrative decision.

---

I.

The Administrative Procedures Act governs the standard of review of an administrative agency's decision. *Henderson v. N.C. Department of Human Resources*, 91 N.C. App. 527, 372 S.E.2d 887 (1988). Section 150B-51 of the North Carolina General Statutes provides in pertinent part that a reviewing court may reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings or conclusions are:

(1) In violation of constitutional provisions;

(2) In excess of statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence . . .; [or]

(6) Arbitrary or capricious.

N.C. Gen. Stat. § 150B-51 (1991). The appropriate standard of review is the "whole record" test, in which the reviewing court must examine all competent evidence to determine if there is substantial evidence to support the administrative agency's findings and conclusions. *Henderson*, 91 N.C. App. at 530, 372 S.E.2d at 889. In turn, the scope

of appellate review of a superior court's consideration of a final agency decision is whether the lower court committed any errors of law in applying the whole record test. *Sherrod v. N.C. Dept. of Human Resources*, 105 N.C. App. 526, 530, 414 S.E.2d 50, 53 (1992).

## II.

Congress established the Medicaid program as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301, 65 L. Ed. 2d 784, 794 (1980). States choosing to participate in this optional program are reimbursed for a portion of their costs in providing medical treatment to needy persons. *See Atkins v. Rivera*, 477 U.S. 154, 156-57, 91 L. Ed. 2d 131, 137 (1986). "Although participation in the Medicaid program is entirely optional, once a state elects to participate, it must comply with the requirements of Title XIX," *Harris*, 448 U.S. at 301, 65 L. Ed. 2d at 794, and the requirements of the Secretary of Health and Human Services. *Atkins*, 477 U.S. at 157, 91 L. Ed. 2d at 137.

In general, states serve two groups of persons through their Medicaid programs. First, states must serve the "categorically needy," defined to include families with dependent children eligible for public assistance under the Aid to Families with Dependent Children ("AFDC") program, 42 U.S.C. § 601 *et seq.*, and aged, blind, and disabled persons eligible for benefits under the Supplemental Security Income ("SSI") program, 42 U.S.C. § 1381 *et seq. See* 42 U.S.C. § 1396a(a)(10)(A); *Harris*, 448 U.S. at 301 n.1, 65 L. Ed. 2d at 795 n.1. Second, states are permitted, but not required, to serve the "medically needy," which refers to those persons in need of medical assistance whose income levels disqualify them from the AFDC or SSI programs. *See* 42 U.S.C. § 1396a(a)(10)(C); *Harris*, 448 U.S. at 301 n.1, 65 L. Ed. 2d at 795 n.1.

Congress created the SSI program in 1972, to take effect 1 January 1974. The new SSI eligibility criteria were broader than some of the prior state-established criteria. *Schweiker v. Hogan*, 457 U.S. 569, 581-82, 73 L. Ed. 2d 227, 237 (1982). In 1974, Congress, fearing that participating states would withdraw from the Medicaid program, added § 209(b) to the Supplemental Security Income Act, 42 U.S.C. § 1396a(f), to encourage continued participation by states with stricter criteria. *See Morris by Simpson v. Morrow*, 783 F.2d 454, 456-57 (4th Cir. 1986). States choosing the § 209(b) option are not

required to provide Medicaid to persons who would not have been eligible under the state medical assistance plan in effect on 1 January 1972, prior to the enactment of SSI. States electing the § 209(b) option are required to operate a program for the medically needy, *Morris*, 783 F.2d at 457, and to adopt an income spend-down provision, *Schweiker v. Gray Panthers*, 453 U.S. 34, 38-39 n.5, 69 L. Ed. 2d 460, 467 n.5 (1981). Since North Carolina has elected to utilize the § 209(b) option, it must have a program for the medically needy, and it may utilize its 1 January 1972 eligibility criteria, if they are more restrictive than the SSI criteria. *See id.* at 38-39, 69 L. Ed. 2d at 466-67.

[1] When a "medically needy" applicant's income or resources exceed the applicable state's Medicaid eligibility limits, the "spend down" rule may apply. *See* 42 U.S.C. § 1396a(a)(17). Under this rule, the applicant may be able to "spend down" excess income or assets, by applying them to outstanding medical bills, to become eligible for Medicaid. "Income spend-down" is the process whereby an applicant's income is reduced for the purpose of determining Medicaid eligibility by the amount of incurred but unpaid medical expenses. "Resource spend-down" is the process which allows Medicaid applicants to offset their resources by incurred but unpaid medical bills. North Carolina currently requires that applicants actually spend excess resources to pay their medical bills before they can qualify for Medicaid. *See* N.C. Admin. Code tit. 10, r. 50B.0311 and 50B.0403 (August 1993).

### III.

In the cases under consideration, the critical question is whether federal and state laws require DHR to use the resource spend-down procedure. After review of this issue, we have concluded that neither federal nor state law requires resource spend-down. We affirm the decisions of the superior courts.

### A.

[2] In determining whether the federal Medicaid program requires states to adopt the spend-down rule, we must examine the following portion of the Medicaid statute:

(a) A State plan for medical assistance must . . .

(17) . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and

resources as are . . . available to the applicant or recipient . . . , (C) provide for reasonable evaluation of any such income or resources, and (D) . . . provide for flexibility in the application of such standards with respect to income by taking into account . . . the costs . . . incurred for medical care or for any other type of remedial care recognized under State law.

42 U.S.C. § 1396a(a)(17).

Courts recognize section 1396a(a)(17)(D) as the "income spend-down rule," finding that state plans must permit a Medicaid applicant to spend down excess income to comply with a state's eligibility standards. *See, e.g., Atkins*, 477 U.S. at 158, 91 L. Ed. 2d at 137-38 (the spend-down mechanism of 42 U.S.C. § 1396a(a)(17) allows the medically needy to spend down the amount by which their income exceeds the eligibility level).

At issue in this case is whether the federal Medicaid regulations, in addition to requiring states to allow income spend-down, require states to allow Medicaid applicants to spend down assets. Petitioners contend that section 1396a(a)(17) obligates states to require resource spend-down. In support of their argument, petitioners emphasize language in section 1396a(a)(17), stating that a Medicaid plan must "provide for reasonable evaluation of any such income or resources."

We find that federal Medicaid law permits, but does not require, states to implement resource spend-down. The federal Medicaid statute does not mention resource spend-down, and this silence has convinced most courts that the rule is permitted, but not required, by the Act. *See, e.g., Roloff v. Sullivan*, 975 F.2d 333, 342 (7th Cir. 1992) ("Indiana's failure to adopt a resource spend down rule does not violate Section 1396a(a)(17)."); *Hession v. Illinois Dept. of Public Aid*, 544 N.E.2d 751, 757 (Ill. 1989) ("Simply stated, we perceive nothing in section 1396a(a)(17) which precludes a State that participates in the Medicaid program from using the resource spend down methodology if it chooses to do so."); *Harriman v. Commissioner DHS*, 595 A.2d 1053, 1055 n.2 (Me. 1991) (federal Medicaid statute "only permits, and does not require, a state to use an asset spend-down"). Accordingly, we conclude that DHR's prohibition of resource spend-down comports with federal law.

B.

[3] Since North Carolina may, but is not obligated to, utilize resource spend-down, we must now determine whether the North Carolina

Medicaid plan mandates that resource spend-down be used in deciding Medicaid eligibility. Petitioners rely upon *Kempson v. N.C. Dept. of Human Resources*, 100 N.C. App. 482, 397 S.E.2d 314 (1990), *aff'd by an equally divided Court*, 328 N.C. 722, 403 S.E.2d 279 (1991), and section 108A-55 of the North Carolina General Statutes, in support of their assertion that North Carolina law requires DHR to utilize resource spend-down.

We must, however, analyze this question without regard to this Court's decision in *Kempson*. Since the members of our Supreme Court were equally divided in voting to affirm and voting to reverse the decision of the Court of Appeals in *Kempson*, the decision of the Court of Appeals is left undisturbed and stands without precedential value. *Kempson*, 328 N.C. at 723, 403 S.E.2d at 279.

Thus, we turn to section 108A-55 of the North Carolina General Statutes, which provides that DHR:

[M]ay authorize, within appropriations made for this purpose, payments of all or part of the cost of medical and other remedial care for any eligible person when it is essential to the health and welfare of such person that such care be provided, and when the total resources of such person are not sufficient to provide the necessary care.

N.C. Gen. Stat. § 108A-55 (Supp. 1993). Petitioners assert that DHR's policy of looking at an applicant's gross, rather than net, assets violates this statute because DHR does not evaluate an applicant's "total resources," as required by N.C.G.S. § 108A-55.

We believe that the North Carolina Medicaid plan does not require DHR to utilize resource spend-down when evaluating Medicaid eligibility for the following reasons. First, the North Carolina Medicaid statute, like the federal statute, does not have a specific resource spend-down provision in its plan. Petitioners have shown us, and we find, no compelling evidence showing that the legislature intended that North Carolina employ a resource spend-down approach. Rather, pursuant to N.C. Gen. Stat. §§ 108A-25(b) and -54 (1988), which grant DHR plenary authority to adopt rules and regulations to administer the Medicaid program, DHR has established rules which prohibit the use of resource spend-down in North Carolina's Medicaid program. N.C. Admin. Code tit. 10, r. 50B.0311 and .0403. "[T]he interpretation of an agency charged with the administration of a statute is entitled to substantial deference. . . . Moreover, the

agency's construction need not be the only reasonable one in order to gain judicial approval." *Connecticut Department of Income Mainte- nance v. Heckler,* 471 U.S. 524, 85 L. Ed. 2d 577, 583-84 (1985).

Second, the federal Medicaid statute contains language similar to language in N.C.G.S. § 108A-55, and the federal statute does not require resource spend-down. Federal law describes the purpose of the Medicaid program as enabling the states to furnish assistance to those "whose income and resources are insufficient to meet the costs of necessary medical services." Similarly, North Carolina law man- dates assistance to those persons whose "total resources . . . are not sufficient to provide the necessary care." Since federal law and North Carolina law contain similar language, we follow 42 U.S.C. § 1396a(a)(17), which permits, but does not require, states to imple- ment a resource spend-down rule. *See supra.* Likewise, we conclude that the North Carolina Medicaid plan does not require resource spend-down.

Next, we believe that an interpretation of section 1396a(a)(34), as mandating resource spend-down, would conflict with 42 U.S.C. § 1396a(f) (the § 209(b) provision) and 42 C.F.R. § 435.851. Section 1396a(f) permits North Carolina to limit Medicaid coverage to per- sons who would have qualified for benefits under the state eligibility methodologies in effect on 1 January 1972. Under 42 C.F.R. § 435.851(c), resource methodologies that were in effect on 1 January 1972 are presumed reasonable. North Carolina's eligibility method- ologies have prohibited resource spend-down since the adoption of the Medicaid program in 1970.

Finally, the history of this issue prior to the adoption of N.C.G.S. § 108A-55 persuades us that our resolution of the issue is the correct one. In August 1980, the U.S. Department of Health and Human Serv- ices, the federal administrator of the Medicaid program, sent a Med- icaid transmittal letter requiring a revision of state plans to eliminate the provision for a spend-down of incurred medical expenses for determining resource eligibility. Subsequent to that letter, in 1981, the North Carolina General Assembly enacted section 108A-55. We do not believe that the General Assembly could have intended that statute to embody resource spend-down when federal rules prohibited such spend-down.

The instant case is distinguishable from cases cited by petitioners from other jurisdictions in which the courts have found a state man- date for resource spend-down. In *Haley v. Com'r of Public Welfare,*

476 N.E.2d 572 (Mass. 1985), the Supreme Judicial Court of Massachusetts examined federal and its own state Medicaid laws to determine if resource spend-down was mandated or just permitted. The court first determined that resource spend-down was a reasonable method of calculating resources and consistent with the goals of Title XIX. *Id.* at 578. The court found a statute "explicitly appl[ying] a resource spend down," *id.* at 579 n.9, as evidence of "the Legislature's determination to ensure an individual's retention of a certain level of resources." *Id.* at 579. Thus, the court held that the Massachusetts Medicaid plan required resource spend-down.

In *Hession*, the Illinois court, relying upon the specific state statute, stated that "[i]n establishing an assistance program for these individuals, the legislature has noted that it is of special importance that their incentives for continued independence be maintained and that their limited resources be preserved." 544 N.E.2d at 757. Based upon this manifestation of legislative intent, the court ruled that individuals should be allowed to retain a certain level of assets and still qualify for medical assistance.

We find nothing in the North Carolina Medicaid plan or its regulations that requires the utilization of resource spend-down. DHR's interpretation of North Carolina's Medicaid plan, prohibiting the use of resource spend-down, is a reasonable one. In drawing this conclusion, we realize the hardship that will befall those whose unspent resources pale in comparison to their medical obligations. In defining eligibility, however, the state has "undisputed power . . . to set the level of benefits and the standard of need." *Dandridge v. Williams*, 397 U.S. 471, 478, 25 L. Ed. 2d 491, 498 (1970). Unfortunately, there are few standards that will not, under some circumstances, produce results which appear harsh. So it is with the cases here.

C.

Petitioner Elliot also argues that DHR violated Mr. Casstevens' due process rights because it refused to pay retroactive medical coverage. Specifically, Ms. Elliot asserts that due process requires government agencies to advise applicants of their programs and of their rights under the programs and to restore benefits when they fail to do so. We find this argument to be without merit since we discern no evidence showing that Ms. Elliot was not aware of DHR's policy concerning Medicaid eligibility requirements, of Mr. Casstevens' responsibility for his own nursing home bills after 31 January 1991,

and of the necessity of Ms. Elliot's reapplication for Medicaid benefits when Mr. Casstevens' resources fell below the $1,500.00 limit.

### D.

Petitioner Sexton alleges that he is entitled to Medicaid benefits since Ms. Sexton qualified for Medicaid on 6 March 1992. He asserts that Ms. Sexton was eligible for Medicaid on 6 March, the day that he called Blue Ridge Bank and requested that they transfer his stock to his daughter. The record is clear, however, that he accomplished the stock transfer on 26 March 1992, rather than 6 March 1992. Accordingly, we find this contention meritless.

### IV.

In conclusion, we rule that neither federal nor North Carolina law mandates resource spend-down. Accordingly, it is reasonable for DHR to have established rules administering the Medicaid plan which prohibit resource spend-down. Since petitioners assets were greater than the allowable reserve limit, respondent properly denied their Medicaid applications, and the trial courts' orders affirming the denials were free of any errors of law.

Affirmed.

Judge WELLS concurs.

Judge JOHN dissents.

Judge WELLS concurred in this opinion prior to 30 June 1994.

Judge JOHN dissenting.

I dissent for the reasons stated by Judge (now Chief Judge) Arnold in *Kempson v. N.C. Dept. of Human Resources*, 100 N.C. App. 482, 397 S.E.2d 314 (1990), *aff'd by an equally divided Court*, 328 N.C. 722, 403 S.E.2d 279 (1991). In *Kempson* we held that "DHR must employ the resource spend-down methodology when determining Medicaid eligibility . . . ." *Id.* at 489, 397 S.E.2d at 318. Although *Kempson* is without precedential authority, the reasoning contained therein is sound and consistent with both federal and state legislation. Consequently, I would adopt the *Kempson* rationale and hold that DHR is required to utilize "resource spend-down" in determining an individual's eligibility for Medicaid payments.

Denial of Medicaid benefits to one whose total assets exceed the allowable limit, yet who has already become obligated to pay medical bills far in excess of that individual's total assets, contravenes the legislative purpose underlying both the Federal and North Carolina medical assistance acts. As the majority points out, federal and state programs were established to furnish assistance to those whose income and resources are insufficient to meet the costs of necessary medical care. The rigidly bureaucratic interpretation urged by respondent DHR ignores the remedial status of our medical assistance legislation. As such, it must be "liberally construed so that the beneficial purpose intended by [its] enactment may be accomplished." *Sutton v. Aetna Casualty & Surety Co.*, 325 N.C. 259, 265, 382 S.E.2d 759, 763, *reh'g denied*, 325 N.C. 437, 384 S.E.2d 546 (1989). As aptly stated by Judge Lewis in a recent dissent, "[w]hen the literal interpretation of a statute contravenes the manifest purpose of the statute, the reason and purpose of the law will be given effect and the strict letter of the statute will be disregarded." *State v. Williams*, 113 N.C. App. 686, 694-95, 440 S.E.2d 324, 328 (1994) (Lewis, J., dissenting).

For the aforementioned reasons, I respectfully dissent.