UNITED STATES ex rel. Allen LAMERS,
Plaintiff–Appellant,

v.

CITY OF GREEN BAY,
Defendant–Appellee.

No. 98–1800.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1998.

Decided Feb. 22, 1999.

**1014**

Robert Parent, Roels, Keidatz & Parent, DePere, WI, Steven D. Gordon (argued), Holland & Knight, Steven A. Diaz, Dykema Gossett, Washington, DC, for Plaintiff–Appellant.

Edward J. Gill, Jr., Willis A. Siegfried (argued), Joseph M. Ramirez, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Allen Lamers of Lamers Bus Lines, Inc. brought this action on behalf of the United States under the *qui tam* provision of the False Claims Act (FCA), 31 U.S.C. § 3730(b). He alleged that in order to remain eligible for annual federal transit grants the City of Green Bay lied to the Federal Transit Administration (FTA) about its efforts to transport local school children on public buses. District Judge Lynn Adelman granted the City's motion for summary judgment, and Lamers appeals.

From 1959 to 1992 the Green Bay Area Public School District contracted with Lam-ers Bus Lines to provide school bus service for its students. In the fall of 1992 the District contacted city-owned Green Bay Transit (GBT) about the possibility of transporting children to and from school on public buses. The motives for this break with tradition were purely financial. By utilizing the existing public transit system the District hoped to save around $33,000 per year on student busing services. After an initial study period, the District and GBT instituted a pilot student busing program for the 1993–94 school year.

Like many municipalities, Green Bay receives annual grants from the federal government to support its public transit system. Each year, as part of the FTA application process, the City must submit assurances of its compliance with all applicable federal statutes and regulations. FTA procedure allows grant recipients to file an initial comprehensive assurance of compliance and incorporate this assurance by reference in all subsequent grant applications. In 1989 Green Bay executed its original "Standard Assurances" stating that the City "will comply with all Federal statutes, regulations, Executive Orders and administrative requirements applicable to [federal transit funding]." In the 1993, 1994, and 1995 grant applications at issue in this case, the City simply reaffirmed that the 1989 Standard Assurances remained accurate.

The Federal Transit Act requires public transit systems receiving federal funds "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." 49 U.S.C. § 5323(f). Recipients may, however, modify their existing public bus routes or establish new routes to accommodate the needs of students so long as the modified or new routes are also open to the general public. FTA regulations dub these permissible modified routes "tripper" service:

*Tripper Service* means regularly scheduled mass transportation service which is open to the public, and which is designed or modified to accommodate the needs of school students and personnel, using various fare collection or subsidy systems.

Buses used in tripper service must be clearly marked as open to the public and may not carry designations such as "school bus" or "school special". These buses may stop only at grantee or operator's service stops. All routes traveled by tripper buses must be within a grantee's or operator's regular route service as indicated in their published route schedules.

49 C.F.R. § 605.3(b). GBT has attempted to operate permissible tripper service to transport Green Bay students.

In the spring of 1993, just before the GBT pilot program began, Byron Kruschke, a manager at Lamers, sent a letter to the FTA complaining that GBT's proposed program violated the tripper regulation because it provided what he characterized as "direct service to and from schools." The FTA forwarded the complaint letter to GBT Transit Director Gary Gretzinger, who responded that the proposed service would only be "an extension of regular routes and utilizing an extra bus, if ridership demands, to avoid overloading." He went on to point out that "[a]ll proposed service will be advertised, open to the public and stop at all designated Green Bay Transit stops." Based on a review of these letters and a review of the proposed pilot program, the FTA determined that the program described permissible tripper service.

In July of 1994, after the first year of the City's pilot program, Lamers filed a formal complaint with the FTA alleging that GBT was conducting prohibited school bus operations. GBT responded by letter to the Lamers complaint, and in January of 1995 the FTA issued an administrative decision. This time, the FTA found that the GBT's program as implemented violated the tripper regulation in three ways: (1) published transit system maps did not show the tripper routes; (2) GBT's "any corner is a stop" policy was inconsistently applied; and (3) tripper buses were running express to school stops without stopping at normal designated bus stops. These violations limited public access to the tripper routes, which meant that the City was in danger of providing "schoolbus transportation that exclusively transports students and school personnel in competition with a private contractor." 49 U.S.C. § 5323(f). The FTA demanded that GBT immediately take three steps to come into compliance: (1) revise published maps to show the tripper routes; (2) eliminate express runs to school stops; and (3) submit a detailed compliance plan to the FTA for approval. The FTA also warned the City that it would make unannounced site visits in the coming year and reserved the right to take further action, including cutting off federal grant funds.

After the decision was issued, regular communication commenced between the FTA and the City regarding GBT's ongoing efforts to come into compliance. In March of 1995, in the midst of this ongoing dialogue, the City submitted its annual grant application and certification that the 1989 Standard Assurances remained accurate. In April of 1995 FTA Regional Counsel Dorval Carter made an unannounced site visit to observe GBT's operations. Mr. Kruschke from Lamers acted as Carter's guide and pointed out what he believed were persistent GBT violations. Carter determined that GBT was still committing the following violations: (1) maps including the tripper routes were not readily available to the public; (2) some buses hopped from one route to another in order to pick up students; and (3) buses sometimes made mid-block stops near schools. On the second day of his visit Carter met with City officials about his concerns and potential solutions.

In June of 1995 Carter returned to Green Bay to meet with City officials, the Green Bay Board of Education, and Lamers representatives to discuss GBT's tripper service. Carter again pointed out the ongoing violations and again mentioned that the FTA would have to discontinue funding if GBT did not achieve full compliance. Then, immediately after Carter's meeting in Green Bay, the FTA approved the City's annual grant application even though it knew that the City had not yet achieved full compliance.

Also in June of 1995, Mr. Lamers filed the instant action in federal district court on behalf of the federal government, alleging that the City had swindled the FTA out of its grant money by lying in its annual applications and in various letters to the FTA.

In September of 1995 Carter made a third visit to Green Bay and observed tripper service operating in full compliance with the FTA decision. In February of 1996 he issued a report finding that the City had met two of the three remedial requirements laid out in the 1995 FTA administrative decision. The third requirement, submission of a comprehensive tripper plan for approval, was considered ongoing because Green Bay had recently decided to make further revisions to its program. Finally, in September of 1996, the FTA reported that GBT was in full regulatory compliance.

There are two issues on this appeal, and the first is whether Lamers met the jurisdictional requirements for a *qui tam* action under the Federal Claims Act (FCA). *See* 31 U.S.C. §§ 3729–33. Since the Civil War, *qui tam* suits have been part of the FCA scheme for preventing fraud against the federal government. The basic idea is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail. The FCA *qui tam* power was largely dormant, however, until the 1930's and 1940's when increased federal government spending led to increased opportunities for unscrupulous government contractors to defraud the government. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 679 (D.C.Cir.1997). Loose jurisdictional requirements allowed virtually anyone to become a *qui tam* plaintiff no matter what the source of their information, and *qui tam* litigation surged. The plain meaning of the FCA even permitted *qui tam* jurisdiction when an opportunistic plaintiff simply copied his fraud complaint directly from the government's criminal fraud indictment against the same defendant. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

Congress finally acted to stop such opportunism by prohibiting *qui tam* actions "based on evidence or information in the possession of the United States . . . at the time the suit was brought." Act of December 23, 1943, 57 Stat. 608, recodified in 31 U.S.C. § 3730(b)(4) (superseded). This prohibition, however, created its own perverse set of incentives.

Now whistle blowers were afraid to turn over their juiciest evidence of fraud to the government because disclosure would prevent them from using that evidence to get their reward in a *qui tam* action. Congress had effectively eliminated any incentive to bring fraud to the attention of the government.

Our decision in *United States ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100 (1984), highlighted the problems with overly restrictive *qui tam* jurisdiction. After an extensive and costly investigation, the state of Wisconsin uncovered serious Medicaid fraud against the federal government. As required by statute, the state reported the fraud to the U.S. Department of Health and Human Services. The state then attempted to bring a *qui tam* action against the perpetrators, hoping to recoup the cost of the investigation. The plain terms of the amended FCA, however, barred the suit because the information was in the hands of the federal government when Wisconsin filed the suit. *See Dean,* 729 F.2d at 1106–07.

After *Dean,* Congress decided once again that the FCA *qui tam* system was out of whack and amended the jurisdictional requirements:

> No court shall have jurisdiction over an action in this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, *unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. . . .*
>
> *For the purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.*

31 U.S.C. § 3730(e)(4) (emphasis added). In this new version Congress hoped to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discourage-

ment of opportunistic plaintiffs who have no significant information to contribute on their own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994).

 In the case before us, all the facts on which Mr. Lamers based his fraud claim were publicly disclosed when the media covered the FTA's 1995 administrative decision. Therefore, we have jurisdiction over this matter only if Lamers was the "original source" of those facts. He is if (1) he had direct and independent knowledge of information on which his fraud allegations are based, and (2) he submitted that information to the government before filing this action.

Lamers cannot be the original source of the allegedly false statements made by the City in its grant applications and letters to the FTA. Those statements were submitted directly to the FTA, and Lamers only learned of them following his request under the Freedom of Information Act.

But Lamers claims that he was the original source of information about how Green Bay was actually implementing its bus service. Green Bay, on the other hand, says that the statements it made to the FTA, not the implementation of its busing program, are the basis for Lamers's fraud claim. Proving fraud, however, requires a comparison between the City's statements regarding the plan and the truth of how the busing was carried out. Therefore, the actual nature of the City's operations that Lamers ascertained through his investigation is "information on which the allegations are based" under the FCA.

There is no question that Lamers had "direct" knowledge of the way GBT was implementing its tripper service. He observed GBT buses in action firsthand. It is also clear that he "provided the information to the government" when he complained to the FTA, filed an administrative complaint, and took the FTA's Mr. Carter on a tour of Green Bay.

The question, which is a close one, is whether Lamers's knowledge of the actual bus route operations was "independent knowledge" under the statute. The typical qui tam plaintiff is a whistle blower at a defense contractor's plant with inside information about a fraud being perpetrated against the federal government. This case does not involve that sort of traditional insider information. Lamers simply walked the streets of Green Bay observing the buses in action. The information he gleaned from this exercise was readily available to government investigators (as Carter discovered on his visits) or even to members of the general public with an unusually keen interest in public transit procedures.

At least one court has held that knowledge obtained through an investigation can be the basis for a qui tam action. *See United States ex rel. Hartigan v. Palumbo Bros., Inc.*, 797 F.Supp. 624, 630–31 (N.D.Ill.1992). In *Hartigan* the state of Illinois had brought a qui tam action based on information it had disclosed to the federal government after an extensive state investigation into fraud on a federally funded highway construction contract. *Hartigan* provides a near-perfect analogy to the *Dean* case involving Wisconsin's medicaid fraud investigation. Because Congress had amended the statute in direct response to *Dean*, the Illinois case was a no brainer. The new jurisdictional provisions were specifically designed to reward states that provide valuable investigative assistance to the federal government. Other courts have also suggested that qui tam jurisdiction is appropriate where the plaintiff becomes an original source through investigative efforts. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins.*, 944 F.2d 1149, 1161 (3d Cir.1991) (stating in *dicta* that plaintiffs may qualify if their information results from their own investigations).

It is not entirely clear, however, that this rationale of rewarding an extensive and costly state investigation applies to Lamers's walkabout on the streets of Green Bay. There may be a point at which this type of private investigator should be termed a busybody and turned away at the courthouse steps. Congress has tried to strike a balance between "encouraging people to come forward with information and ... preventing parasitic lawsuits." False Claims Act Imple-

mentation: Hearing Before the Subcomm. on Admin. Law and Gov. Relations of the House Comm. on the Judiciary, 101st Cong., 2d Sess. 3 (1990) (statement of Sen. Grassley). In our case, we think it's clear that Lamers provided a service to the FTA by keeping an eye on how the City's practices matched up to its statements. He may be viewed by some as a bit of a busybody with his own agenda, but he is certainly not a parasite. And to a certain degree, Congress wanted to encourage busybodies who, through independent efforts, assist the government in ferreting out fraud. We think, for all these reasons, that it's fair to conclude that Lamers was the original source of information on which he bases his fraud claim. Therefore, the district court had jurisdiction to entertain Lamers's claim.

Which brings us to the last issue, whether summary judgment against Lamers was appropriate, a question we review *de novo*. *Transamerica Ins. Co. v. South*, 975 F.2d 321, 327 (7th Cir.1992). Count I of Lamers's claim alleges that the City repeatedly misrepresented the nature of its tripper service for the purpose of obtaining federal funds. An FCA cause of action of this sort requires proof of three elements: (1) the defendant made a record or statement in order to get the government to pay money; (2) the record or statement was false or fraudulent; and (3) the defendant knew it was false or fraudulent. *See* 31 U.S.C. § 3729(a)(2).

Lamers's claim meets the first element because the City's statements in its annual application and letters to the FTA were clearly made in an effort to get the federal government to continue paying the City money. *See United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

As for the second element, the FCA does not define "false" or "fraudulent." As Judge Adelman pointed out in his opinion, it is impossible to meaningfully discuss falsity without implicating the knowledge requirement. For example, we have held that "[i]nnocent mistakes or negligence are not actionable." *Hindo v. University of Health Sciences*, 65 F.3d 608, 613 (7th Cir.1995). The Ninth Circuit has found that errors

based simply on faulty calculations or flawed reasoning are not false under the FCA. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992). And imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA. *See Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir.1996). So our consideration of the falsity question will be incorporated into our knowledge discussion, which we will now attempt to detail.

Under the FCA a person acts "knowingly" if he or she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). Judge Adelman made an extremely thorough and well-reasoned examination of the City's statements under this standard. That examination broke the alleged false statements into four groups: (1) the 1993 Standard Assurances; (2) Mr. Gretzinger's (recall, he's the GBT transit director) letters of June 30, 1993, and August 12, 1994; (3) the 1994 Standard Assurances; and (4) all representations after the FTA's 1995 administrative decision.

When the City submitted its 1993 Standard Assurances, the pilot student busing program was not up and running. Therefore, these were promises of future compliance that were knowingly false only if the City never intended to comply with the applicable regulations. On this point, Lamers provided no credible evidence that the City intended to flout the regulations from the very beginning. He argues that the City engaged in a calculated scam to cheat the FTA out of its grant money. His only evidence to support this theory is the fact that the City may have violated certain state notice and public meeting requirements when it decided to embark on the pilot program. There is little connection between state law public meeting requirements and the truth or falsity of the City's grant applications. There is absolutely no reason to believe that the City intended to violate the regulations from the get-go.

Mr. Gretzinger's 1993 and 1994 letters to the FTA also promise general compliance with transit regulations. They are distinct from the City's yearly Standard Assurances because they specifically state that GBT will be providing tripper service and assure the FTA that tripper routes will be merely "extensions" of regular routes. This is the central lie that Lamers alleges. He argues that Gretzinger knew full well that some City routes had actually been redesigned to accommodate school children. The problem with this argument is that Gretzinger's letters reveal more confusion than artifice. There is nothing in the regulatory definition of tripper service that limits tripper routes to extensions of preexisting routes. In fact, the City may completely redesign its transit system to accommodate school children as long as all routes are accessible to the public and the public is kept informed of route changes. Public transit authorities like GBT design their systems to best meet the transit demands of the community. If GBT knew, for example, that many workers in a factory district lived in a particular neighborhood, they would presumably design routes to better move the workers between the factories and their homes. GBT can, of course, do the same thing to accommodate students.

Apparently, Gretzinger kept insisting that the tripper routes were mere extensions of old routes in the mistaken belief that the regulations required such a characterization. But the FTA was fully apprised of the City's route designs and never complained about them in the least. As late as the June 1995 meeting between Carter and City officials, this confusion about the tripper definition remained. Carter recalls "a light bulb going on halfway through the meeting that we had been talking past each other in terms of their use of the term tripper and my use of the term tripper." So, was Gretzinger lying when he characterized the routes as extensions? At most, he was fudging under the mistaken impression that the City had to meet some definition of "extension" in its route design. Even if this was an outright lie, the lie was immaterial because there was no requirement that the routes be mere extensions of existing routes. While we have

not spoken on the issue, the Fourth Circuit has found a materiality requirement in the FCA. *See United States ex rel. Berge v. Board of Trustees,* 104 F.3d 1453, 1459 (4th Cir.1997). The FTA in no way relied on Gretzinger's characterizations because it recognized no "extension" requirement. Gretzinger's statements, we conclude, were not fraudulent under the Act.

Lamers also alleges that the City lied in its 1994 Standard Assurances because it knew that GBT was committing ongoing violations. It is true that the City was having problems providing clear maps and uniformly applying its "any corner is a stop" policy, as the FTA found in its 1995 administrative decision. In addition, there was evidence that the new tripper routes caused public confusion and drivers waited longer than usual for passengers at school stops. Such minor technical violations, however, seem normal for a new bus program, and they do not give rise to an FCA claim. *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1265 (9th Cir.1996) (not all minor regulatory violations give rise to an FCA claim). Lamers really asks us to infer, based on a handful of technical violations committed by individual drivers in a complex new busing program, that GBT's management consciously orchestrated a campaign to deceive the FTA. To make such an inferential leap, at a minimum we would need some motive on the part of the City for the alleged deception. The City had no financial motive to violate the regulations because the types of violations alleged were not cost-saving. There simply is no reasonable inference that the City knowingly misrepresented its compliance in its 1994 Standard Assurances.

As for the City's statements to the FTA after the January 1995 administrative decision, there is overwhelming evidence that the City was cooperating with the FTA to bring GBT into full regulatory compliance. City officials continued to claim that their tripper routes were extensions, but these statements resulted from confusion and were immaterial, as we have just discussed. Moreover, the FTA approved the City's annual grant application in June of 1995 even

when it knew from Carter's direct inspection that GBT's program was not entirely up to snuff. The notion that the FTA was somehow being duped by the City at this point in the process is absurd. Furthermore, the FTA's decision to work with the City rather than penalizing it was vindicated when the City achieved full compliance in 1996.

 Lamers, it seems, wants to use the FCA to preempt the FTA's discretionary decision not to pursue regulatory penalties against the City. But the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of Federal Transit Act regulations are not fraud unless the violator knowingly lies to the government about them. While his watchdog efforts were somewhat helpful in alerting the FTA to GBT's minor regulatory violations, Mr. Lamers has provided no reason to believe that the City of Green Bay was out to cheat the federal government out of its transit dollars.

In count II of his complaint Mr. Lamers also alleges that the City knowingly made false statements to the FTA to avoid having to pay back the grant funds it fraudulently received. *See* 31 U.S.C. § 3729(a)(7). Because there was no fraud in the first place, there is no violation of § 3729(a)(7).

It is obvious in all this that Mr. Lamers is very unhappy with Green Bay's decision to terminate its long-standing relationship with his company. But the fact of the matter is that the City did not act in bad faith when it sought to find a more efficient way to transport its students. The FCA should not be hauled out in an effort to punish the City for its decision. We affirm the district court's summary judgment in favor of the City of Green Bay.