UNITED STATES of America ex rel. Robert A. DURCHOLZ, and Durcholz Excavating and Construction Co., Inc., Plaintiffs–Appellants,

v.

FKW INC., Defendant–Appellee.

No. 98–2636.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1999.

Decided Aug. 27, 1999.

Charles C. Griffith, Johnson, Carroll & Griffith, Evansville, IN, John C. McDonald (argued), Schottenstein, Zox & Dunn, Columbus, OH, for Plaintiff–Appellant.

Robert F. Stayman (argued), Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, for FKW Inc.

Bradley L. Williams (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, Jeffrey B. Kolb, Emison, Doolittle, Kolb & Roellgen, Vincennes, IN, for Jeffrey J. Strange.

Before POSNER, Chief Judge, and CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Officers at the Crane Naval Surface Warfare Center (Crane) wanted to remove sediment from two ponds located on Crane grounds and solicited bids to do the job. An unsuccessful bidder, Robert Durcholz, and his eponymous company, brought this three-count *qui tam* False Claims Act, 31 U.S.C. § 3729 *et seq.* (FCA), action against FKW, Crane's private general contractor, and Jeffrey Strange, Crane's civilian contracting specialist. The district court granted summary judgment in favor of FKW, *see United States ex rel. Durcholz v. FKW Inc.*, 997 F.Supp. 1159, 1171–74 (S.D.Ind.1998) (*Durcholz II*), and Durcholz appeals.[1] We agree with the district court and accordingly affirm its order granting summary judgment in favor of FKW on all three counts.

This case, like most FCA cases, is "heavily dependent on its facts." *Hindo v. University of Health Sciences/The Chicago Med. School*, 65 F.3d 608, 610 (7th Cir. 1995). The district court has recited the story in some detail in two different published opinions. *See United States ex rel. Durcholz v. FKW Inc.*, 997 F.Supp. 1143, 1146–49 (S.D.Ind.1998) (*Durcholz I*); *Durcholz II*, 997 F.Supp. at 1162–64. We repeat only those facts necessary to the disposition of this appeal.

Debris from a demolition range began to clog two sedimentation ponds, threatening Crane's compliance with various environmental regulations. Crane officials needed to unclog the ponds and quickly. They took three measures to fast-track the pro-

1. Strange and FKW both moved for summary judgment on the ground that they were not proper relators under 31 U.S.C. § 3730(e)(4). The district court rejected this argument as to both defendants. *See Durcholz II*, 997 F.Supp. at 1164–67. It also denied in part Strange's motion for summary judgment, *see id.* at 1167–71, but later certified the relator issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This Court denied Strange's subsequent Petition for Permission to Appeal; Durcholz's case against him is ongoing in the district court. Strange nonetheless filed a "joint" brief with FKW, and his attorney appeared and argued before this Court. However, he is not a proper party to this appeal. We therefore ignore the written and oral arguments which pertain to Durcholz's case against Strange.

ject. First, they decided to have the ponds dredged, a method which is faster, but more expensive, than conventional excavation. Second, they issued the job order contract (JOC) through the JOC manager, FKW. Under the JOC regulations, FKW could then select the sub-contractor without regard to price. Finally, Crane officials classified the project as a "performance specification," which they hoped would speed up the bidding process by requiring the use of conventional line-items from the Unit Price Book (UPB). There were two potential drawbacks with this approach, however: the UPB does not contain line-items for dredging, and the winning bidder could, under the governing regulations, complete the project however it liked, whether by dredging or by excavation.

Recognizing these problems, Crane officials made it clear to Brian Frederick, FKW's site manager, that they expected the ponds to be dredged. They were not concerned about the lack of a dredging line-item; they simply expected bidders to price the dredging project using UPB excavation line-items. Frederick, in turn, informed all interested bidders of these expectations, but also told them that (again, pursuant to the regulations) they would be permitted to submit excavation bids. Using UPB line-items for excavation, Crane officials estimated the project would cost about $373,644; FKW's calculations were virtually identical.

FKW received five bids—one for excavation, three for dredging and Durcholz's $271,700 bid, which, Durcholz told Frederick, he would perform by either excavation or dredging. Midwest Dredge was the next lowest dredging bid, at $369,800. FKW presented a summary of these bids to Crane officials. The summary included the names of the companies and the bid prices, but not the proposed method of performance. Frederick, Strange and various Crane officials discussed the bids at a series of meetings, the particulars of which we discuss later. For now, suffice to say that the Crane officials with decision-making authority believed that Durcholz's bid was for excavation only. Midwest was awarded the contract. FKW forwarded its proposal—priced at $457,812: Midwest's bid price plus FKW's 23% cut—to Crane officials. Pursuant to suggestions from those officials, Midwest included several additional excavation line-items in the proposal in order to help square the final project price with the original estimates. Midwest began dredging the ponds, and FKW submitted an invoice for work completed, still using UPB excavation line-items. A Crane accounting official, claiming that the specific work covered by the line-items had not been completed, refused to pay FKW. Other Crane officials directed FKW to resubmit the invoice without the line-items. FKW followed these instructions; Midwest eventually completed the job; and everyone got paid.

Durcholz's suspicions of fraud resulted in an internal Crane investigation and this lawsuit, which alleges three violations of the FCA. Counts one and two relate to FKW's use of UPB *excavation* line-items in (1) its proposal for and (2) subsequent invoices from the *dredging* project. The presentation of these claims to the government, Durcholz alleges, was fraudulent.

■ To prove a FCA violation, Durcholz must produce evidence that FKW knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval. *See* 31 U.S.C. § 3729(a)(1). The *mens rea* element, "knowingly," requires that the defendant have actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of the information presented; no specific intent to defraud is required. *See id.* at § 3729(b). Thus, "[i]nnocent mistakes or negligence are not actionable"; "[w]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false." *Hindo*, 65 F.3d at 613 (internal quotations and citation omitted). The government's prior

knowledge of an allegedly false claim can vitiate a FCA action. *See, e.g., United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991); *but see United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 442 (E.D.N.Y.1995) (government's knowledge not a bar to a FCA claim if the knowledge is incomplete or acquired too late in the process). If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA. *See Hindo,* 65 F.3d at 613–14; *see also United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999) ("it is impossible to meaningfully discuss falsity without implicating the knowledge requirement").

The district court held that the Crane officials' knowledge—that FKW's proposal and invoices used excavation line-items for the dredging project—barred Durcholz's FCA claims. *See Durcholz II,* 997 F.Supp. at 1171–73. We agree with this reasoning. From the start, Crane officials were more interested in speed than cost and made their decisions in accordance with these priorities. They classified the project as a performance specification in order to expedite the bidding, knowing that the UPB did not contain dredging line-items. They later directed FKW to modify its proposal to match the Midwest bid and told FKW to resubmit its invoices without the excavation line-items. Thus, the government not only knew that FKW's proposal and in-

voices contained excavation line-items, it directed FKW to use those pricing numbers. In essence, then, Durcholz is alleging that the government was defrauded by the very activities that its agents ordered. We decline to hold FKW liable for defrauding the government by following the government's explicit directions.[2] The government knew what it wanted, and it got what it paid for. In this case, the government's knowledge is an effective bar to Durcholz's FCA claim, and we therefore affirm the district court's grant of summary judgment in favor of FKW on counts one and two.

Count three is a slightly different matter. In count three, Durcholz alleged that FKW conspired with Strange to withhold Durcholz's bid and to award the bid to Midwest in violation of the FCA.[3] The district court concluded that Durcholz had produced insufficient evidence of an agreement between FKW and Strange to show a conspiracy to defraud the government and accordingly granted FKW's motion for summary judgment on this count. *See Durcholz II,* 997 F.Supp. at 1173–74. The only evidence of an agreement was testimony that FKW followed Strange's instructions by selecting Midwest in the first instance and later by submitting its proposal using excavation line-items. This evidence was insufficient to defeat a summary judgment motion, the district court held, because it did not tend to show that FKW shared Strange's conspiratorial objective.[4] We too are unable to find any evidence in the record from which a reasonable jury could conclude that FKW and Strange had a meeting of the minds, and

**2.** It appears that Crane officials, wanting to expedite the project and still choose the method of performance, may have stretched the contracting regulations to or beyond their limits. "But the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *Lamers: United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir.1999).

**3.** The FCA provides for conspiracy claims, *see* 31 U.S.C. § 3729(a)(3), and general civil con-

spiracy principles apply. *See, e.g., United States v. Murphy,* 937 F.2d 1032, 1039 (6th Cir.1991).

**4.** Durcholz's FCA claim against *Strange* survived Strange's motion for summary judgment because, the district court concluded, "a reasonable jury could conclude that Strange engaged in a purposeful scheme to defraud the government." *Durcholz II,* 997 F.Supp. at 1170.

we therefore agree with the district court's ultimate conclusion that summary judgment was appropriate as to count three.

Although we affirm the district court's decision, we want to point out one flaw in its analysis of the record. In reaching its conclusion, the district court stated that "there is no evidence that [FKW] knew that Strange's superiors mistakenly believed Midwest submitted the lowest dredging bid." *Durcholz II*, 997 F.Supp. at 1173. However, several Crane officials testified that, during at least one of the meetings at which the bids were discussed, Strange made an affirmative representation that Durcholz was an excavator only and that Frederick did not correct this statement.[5] Viewing this evidence in the light most favorable to Durcholz, as we must when reviewing a summary judgment decision, a jury could conclude that Frederick—because he apparently attended at least one meeting at which the bidders' proposed methods of performance were discussed—was aware that Crane officials were misinformed about Durcholz's intentions.[6] So Durcholz's evidence that FKW conspired with Strange was slightly stronger than the district court believed.

But it was still not strong enough to defeat FKW's summary judgment motion. Durcholz might have argued from this evidence (Frederick's alleged silence in the face of Strange's alleged misinformation) that a reasonable jury could infer that Frederick and Strange were in cahoots to withhold the proper information about Durcholz's bid from Crane officials in order to ensure that Midwest was awarded the dredging contract. It is impossible, however, to infer a meeting of the minds from Frederick's alleged silence alone. There are many plausible explanations for Frederick's silence: it is possible, for example, that Frederick simply was not paying attention in the meeting or even that Frederick quickly recognized an easy opportunity to pad FKW's profits on the pond project. Even were we to believe that Frederick's alleged silence was fraudulent, however, there is nothing to suggest that the objective of his fraud was shared by Strange. In any event and whatever the reason for Frederick's alleged silence, there is no evidence that Frederick was mum in order to advance a plan that he had hatched with Strange. And, in light of all of the other evidence (most of which suggests that throughout the project FKW simply tried to satisfy Strange and other Crane officials by following their orders), no reasonable jury could infer a conspiracy from the meager evidence of an agreement produced by Durcholz. Of course, Durcholz is not required to show an express agreement; conspiracies, by their very nature, are not often susceptible to direct proof. To avoid summary judgment, however, he must produce more than "a whiff of the alleged conspirators' assent." *Kunik v. Racine County, Wisc.*, 946 F.2d 1574, 1580 (7th Cir.1991). Durcholz has failed in this task. The facts here are simply insufficient to support the inferential leaps that would be required to conclude that FKW conspired with Strange.

AFFIRMED

---

**5.** The conflicting testimony about whether Strange knew that Durcholz could do the job by dredging formed, in part, the basis for the district court's decision to deny Strange's motion for summary judgment. *See Durcholz II*, 997 F.Supp. at 1169.

**6.** Frederick, of course, denies that the bidders' proposed methods of performance—excavation or dredging—were ever discussed at any of the meetings he attended.