**UNITED STATES of America and State of Illinois, ex. rel. Tenna L. HUMPHREY, Plaintiff,**

v.

**FRANKLIN–WILLIAMSON HUMAN SERVICES, INC., Defendant.**

No. 99–CV–4346–JPG.

United States District Court, S.D. Illinois.

March 11, 2002.

Gerald M. Burke, Assistant U.S. Attorney, Fairview Heights, IL, Ronald E. Osman, John T. Keller, Ronald E. Osman & Associates, Marion, IL, Robert A. Barba, Illinois Attorney General's Office, Chicago, IL, for plaintiff.

Don E. Prosser, Gilbert, Kimmel, et al., Carbondale, IL, Susan L. Burke, Mintz, Levin, et al., Washington, DC, for defendant.

### MEMORANDUM AND ORDER

GILBERT, District Judge.

This matter comes before the Court on the motion of defendant Franklin–Williamson Human Services, Inc. ("FWHS") to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 70). Plaintiff Tenna L. Humphrey ("Humphrey") has responded to the motion (Docs. 76 & 77), and FWHS has replied to the response (Doc. 79). The Court also considers Humphrey's motion to strike the exhibits attached to FWHS's motion to dismiss (Doc. 74). FWHS has responded to the motion (Doc. 80).

### I. Motion to Strike

As a preliminary matter, FWHS's motion to dismiss refers to matters outside the pleading. When such material is presented in connection with a Rule 12(b)(6) motion to dismiss, the Court may convert the motion to dismiss into a motion for summary judgment or it may exclude the additional material from consideration. In this case, the Court declines to consider the additional materials and will consider this motion as it was captioned, under Rule 12(b)(6). Because the Court is well able to confine itself to considering the appropriate materials, there is no need to strike the matters outside the pleading. Accordingly, the Court DENIES as moot Humphrey's motion to strike (Doc. 74) those matters.

### II. Motion to Dismiss

FWHS asks the Court to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6). Although the motion purports to seek dismissal of the entire complaint, it only addresses the claims brought in counts 1 and 2 but not the claim brought in count 3. The Court will therefore limit its consideration to counts 1 and 2.

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff. *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir.), *cert. denied*, 531 U.S. 880, 121 S.Ct. 191, 148 L.Ed.2d 132 (2000). The Court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any

set of facts consistent with the complaint. *Id.* at 405.

Humphrey filed this *qui tam* action pursuant to 31 U.S.C. § 3730(b)(1) and 740 ILCS 175/4(b)(1), alleging that FWHS violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) and (2), and the Illinois Whistleblower Reward and Protection Act ("Whistleblower Act"), 740 ILCS 175/3(a)(1) and (2) in connection with its billing practices, as outlined below. FWHS agrees that Humphrey's description of its billing practices are accurate but denies that such practices violate the law. The following section outlines the allegations in counts 1 and 2 of Humphrey's complaint against the general regulatory background.

### A. *Allegations*

#### 1. *Medicaid and the Spenddown Programs* [1]

FWHS provides medical services to needy people. The Medicaid program assists needy people to pay medical bills and is funded by the federal government and the state of Illinois. Some of FWHS's indigent patients qualify for Medicaid assistance because their incomes and/or assets are below the threshold necessary to qualify for the Medicaid program. Others who exceed the Medicaid income/asset threshold qualify for assistance only after they have incurred certain costs for their medical care that are not covered by Medicaid. This program of contingent receipt of Medicaid assistance is called the Spenddown Program. Under the Spenddown Program, the state looks at a patient's finances and determines the amount of medical costs that the patient must incur before becoming eligible for Medicaid assistance ("spenddown obligation"). The spenddown obligation is equivalent to the amount by which the patient's income and/or asset level exceeds the threshold to qualify for Medicaid. After the patient incurs the spenddown obligation, he is eligible for Medicaid assistance for additional medical costs. If a patient does not incur enough costs to reach his spenddown obligation, he is not eligible for Medicaid assistance.

The patient must show documentary proof to the Illinois Department of Public Aid ("IDPA") that he has incurred the spenddown obligation before he can receive a medical card that entitles him to Medicaid assistance for additional medical costs. Two types of documents are sufficient documentary evidence: (1) receipts or other documents showing the amount of money that a patient has paid for medical care and (2) bills from a medical provider showing that the patient is liable for costs for medical care (he need not actually have paid those costs yet).

#### 2. *Grant Assisted Fee Program*

Independent of Medicaid, FWHS provides additional medical cost assistance to some patients though grants from the state of Illinois. FWHS enters into Grant Assisted Fee ("GAF") agreements with those patients ("GAF patients"). Under those agreements, patients agree to be liable for reduced payments for services they receive—normally between $2.00 and $7.00 per hour depending on the patient's income, household size and insurance coverage—as opposed to the rates billed to other patients or the rates charged to Medicaid eligible patients ("Medicaid allowable rate"). The Medicaid allowable rate is significantly higher than the rate GAF patients agree to pay under the GAF agreements. State grants pay the difference between the actual charge to the

---

**1.** The relevant statutes and regulations governing the Medicaid and the Spenddown Program issues in this case are discussed later in this order.

patient ($2.00 to $7.00) and the Medicaid allowable rate.

### 3. *Alleged Fraudulent Practices*

·The alleged fraud occurs at the intersection of the Spenddown and GAF programs. After FWHS serves a GAF patient who is also in the Spenddown Program, it prepares a statement showing that the GAF patient is liable for the Medicaid allowable rate for the services provided, not the rate agreed to under the GAF agreement. It then instructs the GAF patient to present the statement to the IDPA as documentary support that the patient has incurred medical costs that count toward the spenddown obligation. The patient is actually liable by virtue of the GAF agreement for far less, and FWHS instructs the patient not to submit to IDPA receipts for any amounts that they actually paid pursuant to the GAF agreement.

Once the patient has documentation that he has satisfied his spenddown obligation and receives his medical card, FWHS submits Medicaid claims on behalf of the patient for additional medical services at Medicaid allowable rates. Medicaid pays those claims.

### 4. *The Complaint—Counts 1 and 2*

Humphrey alleges that FWHS has violated the FCA and the Whistleblower Act since August 1991 by causing its GAF patients who are also in the Spenddown Program to provide IDPA with false statements in support of the patients' claims for Medicaid assistance. The statements prepared by FWHS are false, she alleges, because they assert that the patients are liable for the Medicaid allowable rates when they are really only liable for rates agreed to under the GAF agreements. As a result, a patient is able to receive Medicaid assistance before he has become liable for the amount of his spenddown obligation. Thus, FWHS is able to submit and receive payment for Medicaid claims on behalf of the patient for Medicaid allowable rates sooner—assuming the patient would even satisfy his entire spenddown obligation—than it would if the patient had only counted his liability under a GAF agreement toward meeting that obligation. Humphrey alleges that FWHS has prepared such false statements for approximately 70 patients each month and gives specific examples of six such patients.

### B. *Statutes Governing False or Fraudulent Claims*

### 1. *False Claims Act*

The FCA, 31 U.S.C. §§ 3729 *et seq.*, penalizes those who submit or cause to be submitted to the United States false or fraudulent claims for payment. 31 U.S.C. § 3729(a)(1). It also penalizes those who make or use false statements to get a false or fraudulent claim paid. 31 U.S.C. § 3729(a)(2).

The FCA provides incentives for and rewards to private citizens for pursuing in civil *qui tam* suits those who violate the FCA. "Since the Civil War, *qui tam* suits have been part of the FCA scheme for preventing fraud against the federal government. The basic idea is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016 (7th Cir.1999); *see* 31 U.S.C. § 3730(b) & (d).

▆▆▆ In order to succeed in a *qui tam* cause of action based on false submission of claims, a plaintiff must prove that (1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false or fraudulent and (3) the defendant knew it was false or fraudulent. With respect to a cause of action based on the use of a false statement, a

plaintiff must prove (1) the defendant made or used a statement in order to get the government to pay money, (2) the statement was false or fraudulent and (3) the defendant knew it was false or fraudulent. *Lamers*, 168 F.3d at 1018.

### 2. *Whistleblower Act*

The Illinois Whistleblower Act, 740 ILCS 175/1 *et seq.*, tracks the relevant provisions of the FCA almost word for word, substituting the appropriate state references for the federal ones in the FCA. *See* 740 ILCS 175/3(a)(1) & (2) (prohibited acts); 740 ILCS 175/4(b) (private citizen suits) & (d) (award to plaintiff; also discusses Illinois Whistleblower Reward and Protection Fund). The Court has been unable to locate any cases discussing the Whistleblower Act and the elements of a claim under that act. However, because the Whistleblower Act is virtually identical in all relevant aspects to the FCA, the Court will look to FCA caselaw for guidance in relation to count 2.

### C. *Analysis*

In this case, the first element of an FCA claim, and also therefore a Whistleblower Act claim, has been alleged. Humphrey alleges that FWHS made a type of statement to get the government to pay money—the statement prepared for GAF patients to present to IDPA to document that they have met their spenddown obligation. This type of statement enabled FWHS to make claims and receive Medicaid payments for subsequent services to those patients. Humphrey also alleges that FWHS made claims on the government for those Medicaid payments.

Humphrey has adequately pled the second element as well. She alleges that the statements given to GAF patients were false because they reflected that the patients were liable for amounts they did not actually owe. FWHS's Medicaid claims, she alleges, were therefore false because

they sought benefits when all the prerequisites to receiving those benefits had not been legitimately met. Thus, whether Humphrey's claims can survive a motion to dismiss turns on whether she has sufficiently alleged the third element of each test, that is, that the defendant knew the statements and claims were false or fraudulent.

With respect to the third element—knowledge of the false or fraudulent nature of the claim or statement—innocent mistakes or negligence will not suffice. Neither will a difference in interpretation growing out of a disputed legal question suffice. *Lamers*, 168 F.3d at 1018. A defendant must "know" that a claim or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2) act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity. 31 U.S.C. § 3729(b). The defendant need not have the specific intent to defraud the government as long as he knows the falsity of the claim or statement. *Id.* However, "[t]he government's prior knowledge of an allegedly false claim can vitiate a FCA action." *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544–45 (7th Cir. 1999). "If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *Id.* at 545.

FWHS claims that it has not violated the FCA or the Whistleblower's Act because its claims that its Medicaid billing practices were not false or fraudulent. It claims that its billing practices were perfectly legal in light of a 1987 amendment to Title XIX of the Social Security Act, Pub.L. No.100–203 § 4118(h)(1), as amended by Pub.L. No. 100–360,

§ 411(k)(10)(G)(ii) (codified at 42 U.S.C. § 1396a(a)(17)). Consequently, it could not have possibly "known" that those practices were improper.

Because FWHS's argument may have merit if, indeed, its billing practices were proper, the Court will examine the question of whether those practices complied with Medicaid rules. If FWHS's billing practices complied with Medicaid statutes and regulations, FWHS could not have "known" that they were improper. If, on the other hand, FWHS's billing practices did not comply with Medicaid statutes and regulations, it is possible under a set of facts consistent with those pled in the complaint that FWHS "knew" that its billing practices were improper and that the statements they prepared and claims they made were false or fraudulent.

### 1. *Statutory and Regulatory Scheme*

A thorough analysis requires a brief outline of the statutory and regulatory Medicaid scheme.

*Federal Statutes:* As noted earlier, Medicaid, the program created by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is funded by federal and state dollars. The federal government reimburses participating states for a portion of the costs of providing medical services to needy people. *See Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 122 S.Ct. 962, 966, 151 L.Ed.2d 935 (2002). The Medicaid program is designed to provide medical assistance to two types of needy people: (1) those who are eligible for cash assistance under certain programs such as the Supplemental Security Income for the Aged, Blind, and Disabled ("SSI") program or the Aid to Families with Dependent Children ("AFDC") program (the "categorically needy") and, (2) at a state's option, those who cannot pay their medical bills and are not eligible to participate in the SSI or AFDC pro-

grams because of their income or assets ("medically needy"). *Atkins v. Rivera*, 477 U.S. 154, 157–58, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986); *accord Hession v. Illinois Dep't of Public Aid*, 129 Ill.2d 535, 136 Ill.Dec. 65, 544 N.E.2d 751, 754 (1989). Medically needy people may qualify for Medicaid assistance after satisfying a deductible calculated on the basis of their income and resources above the threshold for participation in AFDC or SSI. *Atkins*, 477 U.S. at 157–58, 106 S.Ct. 2456;

To receive federal money under Medicaid, a state must develop a medical assistance plan that complies with the requirements set forth in 42 U.S.C. § 1396a. Subsection (a)(17) provides the standards that states must implement to determine when a medically needy person is eligible for Medicaid assistance. That section requires a state plan to allow medically needy people to qualify for Medicaid benefits if they incur medical expenses in an amount that reduces their assets to the AFDC or SSI eligibility level. *See Atkins*, 477 U.S. at 157–58, 106 S.Ct. 2456; *Hession*, 136 Ill.Dec. 65, 544 N.E.2d at 757. Prior to the 1987 amendment cited by FWHS in its response, the relevant provision stated:

> A State plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... provide for flexibility in the application of such standards with respect to income by taking into account ... the costs (whether in the form of insurance premiums or otherwise) incurred for medical care....

§ 1396a(a)(17)(D) (1986). A 1987 amendment added the provision that a Medicaid applicant's medical costs incurred but reimbursed by a public program should not be considered in the applicant's asset level and should count toward the spenddown

obligation. Pub.L. No. 100–203, § 4118(h)(1). After the amendment, § 1396(a)(17)(D) stated:

> A State plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... provide for flexibility in the application of such standards with respect to income by taking into account ... the costs (whether in the form of insurance premiums or otherwise and *regardless of whether such costs are reimbursed under another public program of the State or political subdivision thereof*) incurred for medical care....

(emphasis added).[2]

*Federal Regulations:* Regulations promulgated by the Department of Health and Human Services provide further detail as to the eligibility standards states must implement before being able to participate in the Medicaid program. The regulations governing the Spenddown Program provide, in pertinent part:

> *Deduction of incurred medical expenses.* If countable income exceeds the income standard, the agency must deduct from income medical expenses incurred by the individual or family or financially responsible relatives that are not subject to payment by a third party. An expense is incurred on the date liability for the expense arises....

42 C.F.R. § 435.831(d) (2001).[3]

*State Statutes:* Illinois's medical assistance program, codified in the Illinois Public Aid Code, 305 ILCS 5/5–1 *et seq.*, and administered by the IDPA, implements the federal standards and therefore qualifies to be a part of the Medicaid program. Illinois law provides:

> Medical Assistance under this Article shall be available to ... Persons otherwise eligible for basic maintenance under Articles III[SSI] and IV [AFDC] but who fail to qualify thereunder on the basis of need, and who have insufficient income and resources to meet the costs of necessary medical care ....

305 ILCS 5/5–2(2) (1993).[4] Although not expressly stated in this statute, in order to comply with 42 U.S.C. § 1396a(a)(17)(D) the determination of who has "insufficient income and resources to meet the costs of necessary medical care" must not be based on reimbursement of incurred costs by state programs.

*State Regulations:* The IDPA, in turn, has promulgated regulations for Medicaid eligibility standards in Illinois. Those regulations provide that a person otherwise eligible for the program except for his income or assets must meet his spenddown obligation—the amount by which his assets and income exceed the requirements of the program—before becoming eligible for Medicaid assistance. *See* 89 Ill. Admin. Code 120.10(d), 120.60(c)(1), 120.384(b)(2)(A) (2000). The regulations further specify:

> The client meets the spenddown obligation by incurring or paying for medical expenses in an amount equal to the spenddown obligation.
>
>   *    *    *    *    *    *
>
> C) If a service is provided during the eligibility period but payment may

---

**2.** A 1990 amendment added another phrase to § 1396a(a)(17)(D), but that amendment is not relevant to this case.

**3.** The Court has not found any material changes to this provision throughout the time period relevant to this case. If the parties believe there have been material changes,

they may bring them to the Court's attention through a motion to reconsider.

**4.** An amendment effective July 1, 2000, added additional subsections to 305 ILCS5/5–2(2), but that amendment is not relevant to this case.

be made by a third party, such as an insurance company, the medical expense will not be considered toward spenddown until the bill is adjudicated. When adjudicated, that part determined to be the responsibility of the client shall be considered as incurred on the date of service.

89 Ill. Admin. Code 120.60(c)(3) (2000).[5] "When proof of incurred medical expenses equal to the spenddown obligation is provided to the local [IDPA] office, eligibility for medical assistance shall begin effective the first day that the spenddown obligation is met." 89 Ill. Admin. Code 120.60(c)(4)(C) (2000); see 89 Ill. Admin. Code 120.384(b)(2)(C) (2000) ("Spenddown is met by presenting allowable medical bills or receipts to the [IDPA] that equal the amount of the individual's excess countable income and/or non-exempt assets.")

### 2. Meeting Spenddown Obligation

FWHS believes that Congress amended 42 U.S.C. § 1396a(a)(17) in 1987 to allow individuals to count medical costs that are paid by state grants toward meeting their spenddown obligation. FWHS argues that Congress added this provision because it did not want to force states to bear through grant programs the lion's share of the health care costs for the needy who may never be able to afford to spend their own resources to meet their spenddown obligation. It intended, FWHS argues, to allow state grant money to satisfy the spenddown obligation. Congress's choice of the words "incurred" to describe medical expenses and "reimbursed" to describe

how a patient receives the benefit of a public program should not be read to exclude situations in which a patient is technically not "reimbursed" but instead is able to avoid "incurring" liability in the first place for medical costs by virtue of the program. In support of its position, FWHS cites legislative history of the 1987 amendment to § 1396a(a)(17)(D). The legislative history also uses the terms "incur" and "reimbursed" to describe costs that states must consider when determining whether an individual meets a spenddown obligation:

The Committee amendment would clarify that, for purposes of establishing eligibility for medically needed coverage, an individual can incur medical expenses regardless of whether such costs are reimbursed under another public program of the State or locality.

H.R.Rep. No. 100–391(I) at 536 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–356 (emphasis added). FWHS does not address the Illinois statutes and regulations governing Medicaid eligibility requirements in this state.

Humphrey, on the other hand, argues that "incurred" and "reimbursed" in § 1396a(a)(17)(D) mean what they say: "incurred" and "reimbursed." A state grant that allows a patient to avoid incurring liability for medical costs is not equivalent to reimbursement for those costs and should not be counted toward a patient's spenddown obligation. Further, she argues, FWHS statements that reflect that a patient is liable when he is not actually liable because of a state grant program are false statements.[6] Presum-

---

**5.** The text set forth in this order is the current version of the regulation. The Court has not found any material changes to these provisions throughout the time period relevant to this case. If the parties believe there have been material changes, they may bring them

to the Court's attention through a motion to reconsider.

**6.** In support of this position, Humphrey cites to the IDPA Policy Manual and a brochure entitled "Spend down: Billing for Medicaid Community Mental Health Services." The

ably, Humphrey would have no problem with a statement containing accurate dates and services provided that reflects that the patient owed FWHS the GAF payment and that state grants made up the difference between that payment and the Medicaid allowable rate. Such a statement, in her view, would not be false because it accurately reflects FWHS's billing practices. The Court will first take a careful look at the federal statute to see if it is dispositive of the pending motion.

■ When interpreting a federal statute, the Court must try to ascertain the intent of Congress when it enacted the statute. This task starts with an examination of the text of the statute, generally the most reliable indicator of congressional intent. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *Visiting Nurses Assoc. of S.W. Ind. v. Shalala,* 213 F.3d 352, 355 (7th Cir.2000). If the statutory language provides a clear answer, the Court need look no further to divine congressional intent. *Hughes Aircraft,* 525 U.S. at 438, 119 S.Ct. 755. Words used in statutes must be given their ordinary and plain meaning, and the Court may consult dictionaries to guide its determination as to the meaning of a term. *Sanders v. Jackson,* 209 F.3d 998, 1000 (7th Cir.2000).

"Incur" and "reimburse" are the words on which the parties focus their arguments. Dictionaries define "incur" to include "to render oneself liable to (damage)," *Oxford English Dictionary* (2d ed.1989), *available at http://dictionary.oed.com/cgi/entry/00114958,* and "to become through one's own action liable or subject to," *id.; accord Webster's II New Riverside University Dictionary* 621 (1988). Black's Law Dictionary defines "incur" as "To suffer or bring on oneself (a liability or expense)." *Black's Law Dictionary* 771 (7th ed.1999). Clearly, the word "incur" connotes taking on a liability.

■ As for "reimburse," dictionaries define that word to mean "1. To repay or make up to one (a sum expended).... 2. To repay, recompense (a person)," *Oxford English Dictionary* (2d ed.1989), *available at http://dictionary.oed.com/cgi/entry/00201534,* and "1. To repay ... 2. To pay back or compensate (a person) for money spent or for losses or damages incurred," *Webster's II New Riverside University Dictionary* 991 (1988). Black's Law Dictionary defines "reimburse" to mean "1. Repayment. 2. Indemnification." *Black's Law Dictionary* 1290 (7th ed.1999). Clearly, the word "reimburse" signifies a *re* payment for money already spent. Thus, by its plain language, § 1396a(a)(17)(D) requires that a state's Medicaid income eligibility standards, at a minimum, take into account costs for which a patient becomes liable *and* for which he pays but is repaid by state grants.[7] Federal regulations also indicate that, at a minimum, expenses must count toward an individual's spenddown obligation if they

---

Court will not consider these documents in deciding this motion for the same reasons it does not consider the attachments to FWHS's motion.

7. There is some support in the legislative history of § 1396a(a)(17)(D) that "reimburse" should not be taken literally. In the example provided in the legislative history, an individual becomes liable for certain medical costs. She submits a statement of her liability to Medicaid, which pays the portion of her lia-

bility above her spenddown obligation. She then submits the balance of her bill, the amount of her spenddown obligation, to a state program, which pays that portion. The individual ends up spending nothing out of her own pocket for which she could be "reimbursed." H.R.Rep. No. 100–391(I) at 536 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–356. The legislative history, however, does not provide any basis for reading "incurred" to mean anything other than "incurred."

are the liability of an individual and not the obligation of a third party. 42 C.F.R. § 435.831(d) (2001). This case does not involve such medical costs. Here, GAF patients do not become liable for or pay more than their GAF payments. The state does not repay them for any costs but instead lessens their liabilities by virtue of grant programs. Thus, § 1396a(a)(17)(D) by its plain terms has no bearing on this case, which must then turn on state law.

■ Regardless of § 1396a(a)(17)(D) and 42 C.F.R. § 435.831(d), state Medicaid program eligibility standards may take into consideration other medical expenses not listed in federal law, such as those for which a patient has avoided liability by virtue of a state grant program or those for which a patient has become liable but which are actually paid by a state grant. The flexible approach mandated by § 1396(a)(17)(D) allows states to take a more liberal approach but does not require them to do so. *See Williams v. St. Clair*, 610 F.2d 1244, 1248 (5th Cir.1980). The Court must look to Illinois law to decide if Illinois' spenddown program takes a more liberal approach than federal law requires.

■ Illinois statutes do not contain any general mandate regarding specific costs that may count toward the spenddown obligation. Generally, Illinois law provides that individuals are eligible for Medicaid if they "have insufficient income and resources to meet the costs of necessary medical care." 305 ILCS 5/5–2(2) (1993).[8] The one specific exception to the general provision prohibits consideration of certain grants when determining whether a pa-

tient has met his spenddown obligation and can receive Medicaid assistance:

The amount and nature of medical assistance shall be determined by the County Departments in accordance with the standards, rules, and regulations of the Illinois Department of Public Aid, with due regard to the requirements and conditions in each case, including contributions available from legally responsible relatives. However, the amount and nature of such medical assistance *shall not be affected by the payment of any grant* under the Senior Citizens and Disabled Persons Property Tax Relief and Pharmaceutical Assistance Act [320 ILCS 25/1 *et seq.*] or any distributions or items of income described under subparagraph (X) of paragraph (2) of subsection (a) of Section 203 of the Illinois Income Tax Act. [35 ILCS 5/203] . . . .

305 ILCS 5/5–4 [9] (emphasis added). Thus, a patient reimbursed by a grant under the Senior Citizens and Disabled Persons Property Tax Relief and Pharmaceutical Assistance Act, or a patient who is able to avoid liability by virtue of one of those grants, has achieved as much with respect to meeting his spenddown obligation as if he had become liable for the medical cost and paid for it out of his own pocket. Significantly, the parties have not identified and the Court has been unable to locate on its own any other statute indicating that other grants are to be treated in the same way. If the Court were to follow the interpretive maxim *expressio unius est exclusio alterius*—the expression of one thing excludes all others—it would conclude that no other grants are to be exempt from consideration in medical eli-

---

**8.** The July 2000 amendment specifies an income threshold for eligibility that uses as the relevant figure "income, after the deduction of costs incurred for medical care and for other types of remedial care." 305 ILCS 5/5–2(2)(a)(ii).

**9.** This statute, as set forth in this order, reflects amendments during the time period relevant to this case. None of the amendments, however, is relevant to the issues in this case.

gibility decisions except as expressly provided by 42 U.S.C. § 1396a(a)(17)(D). Stated another way, patients' grant awards under other grant programs *should* affect the amount and nature of the medical assistance available under Medicaid unless they are the type mentioned in § 1396a(a)(17)(D). As noted above, the grants in the case at bar are not that type.

IDPA regulations are generally consistent with such an interpretation. They require a patient to incur—that is, become liable for—or pay for medical expenses before those expenses can be counted toward the spenddown obligation. 89 Ill. Admin. Code 120.60(c)(3) (2000). The regulations also evidence an intent that only costs for which the patient is actually responsible should count toward the spenddown obligation. *See* 89 Ill. Admin. Code 120.60(c)(3)(C) (2000). Section 120.60(c)(3)(C) provides that where a third party, such as an insurer, is obligated to pay part of a patient's bill, the costs will not be applied towards the spenddown obligation until after the bill is adjudicated between the third party and the patient. After the adjudication is complete, only the part of the bill for which the patient is responsible counts toward meeting the spenddown obligation.

In the case at bar, the state grant program appears to be in the same position as an insurance company. By virtue of independent contracts with the patient, and possibly the provider, the insurer or the grant program assumes some of the liability that the patient would otherwise incur for the services. IDPA regulations are clear that the insurer or grant program must first determine with the patient the amount of the total cost for which each is liable. Only the patient's liability as determined in that adjudication counts toward the spenddown obligation. In this case, a GAF patient's liability is limited to the amount he or she has agreed to pay under a GAF agreement. Thus, IDPA regulations indicate that only the GAF payment should count toward a GAF patient's spenddown obligation.

■ Because it appears that FWHS's billing practices did not comply with Medicaid statutes and regulations, Humphrey may be able to prove that FWHS "knew" that its billing practices were improper and that the statements they prepared and claims they made were false or fraudulent. Under a set of facts consistent with those pled in the complaint, Humphrey may be able to prove that FWHS knew that its statements as to the liability of its GAF patients were not statements of their actual liability and that the statements were prepared in a knowing, deliberately ignorant or reckless effort to circumvent Illinois Medicaid regulations that allow only amounts for which a patient is liable to be counted toward a spenddown obligation. The Court is satisfied that Humphrey has adequately alleged the third element of an FCA and Whistleblower Act claim—knowledge of the false or fraudulent nature of the claim or statement. Thus, FWHS is not entitled to dismissal of counts 1 and 2 for failure to state a claim. Whether the federal government's prior knowledge of FWHS's allegedly false claims vitiates potential FCA and Whistleblower Act violations is a question that will undoubtedly be resolved later in this proceeding in a motion for summary judgment.

## III. Conclusion

For the foregoing reasons, the Court hereby **DENIES as moot** Humphrey's motion to strike (Doc. 74) and **DENIES** FWHS's motion to dismiss counts 1 and 2 (Doc. 70). The Court **FURTHER ORDERS** that this case is **REFERRED** to Magistrate Judge Philip M. Frazier for

scheduling and all other non-dispositive pretrial matters.

**IT IS SO ORDERED.**